[No. S037006. Apr. 10, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JAMES HUGGINS, Defendant and Appellant.

### COUNSEL

Peter Gold, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Gerald A. Engler, Assistant Attorneys General, Ronald S. Matthias and Allan Yannow, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**MORENO, J.**—An Alameda County jury convicted Michael James Huggins of one count each of murder (Pen. Code, § 187),[1] burglary (§ 459), and robbery (§ 211). The jury found true the special circumstance allegations that defendant committed the murder in the course of, or immediate flight from, burglary, robbery, and rape or attempted rape (§ 190.2, former subd. (a)(17)(i), (iii), and (vii), now subd. (a)(17)(A), (C), and (G)). The jury also found true allegations that defendant personally used a firearm (§ 12022.5) and inflicted great bodily injury on the victim (§ 12022.7). The court, sitting without a jury, found true allegations that defendant previously had been convicted of two serious felonies within the meaning of section 667, along with a third prior felony conviction. The jury was unable to reach a verdict on the penalty and the court declared a mistrial. A new jury was impaneled, and it returned a verdict of death. The trial court entered judgment accordingly. This appeal is automatic. (§ 1239, subd. (b).)

Except for a sentence enhancement for prior convictions under section 667, subdivision (a), which must be set aside (see *post,* at p. 255), the judgment is affirmed.

### COMPETENCY TRIAL BEFORE GUILT PHASE

Defendant claims that instructional error at a competency trial before the guilt phase violated his due process rights under the Fifth and Fourteenth Amendments to the federal Constitution, as codified in section 1367.

#### FACTUAL BACKGROUND

In 1986, while the present criminal charges were pending, defense counsel represented to the court that defendant was either unwilling or, because of

---

[1] Further statutory references are to the Penal Code, unless otherwise noted.

mental problems, unable to communicate with him for extended periods. Counsel requested a competency evaluation in Alameda County Municipal Court "to see if that's a matter of willfulness on his part or an inability on his part." The municipal court declared a doubt as to defendant's mental competency, and the Alameda County Superior Court ordered a trial to determine defendant's mental competency.

At the competency trial, which was held before a jury in 1987, expert and lay witnesses presented conflicting testimony about defendant's mental state.

Defendant's witnesses testified that he lacked the capacity to understand the nature of the proceedings against him, to consult with counsel, or to assist in preparing his defense.

James O. Palmer, Ph.D., a licensed clinical psychologist, testified that he administered psychological tests to defendant, but defendant acted so bizarrely that Dr. Palmer "thought it was possible that he was just putting me on." He suspected defendant was malingering at times. But at times defendant would neglect to malinger and Dr. Palmer was able to observe him. When Dr. Palmer administered a Rorschach test, defendant appeared "not [to be] malingering," but instead to be "confused." Dr. Palmer opined that defendant may have given absurd answers to test questions because he admittedly had used phencyclidine (PCP) in jail. Tests that Dr. Palmer administered on a later occasion revealed brain damage. Dr. Palmer concluded that defendant was not competent to stand trial.

John B. Peschau, Jr., M.D., a psychiatrist, testified for defendant that defendant suffered from paranoid schizophrenia. Dr. Peschau said that during the examination defendant tried to malinger, but that his malingering was an overlay that did not detract from Dr. Peschau's observations of his genuine mental illness. Dr. Peschau agreed that if defendant's behavior were markedly different in jail than when being examined for signs of mental illness, it would suggest malingering. At one point, defendant referred to a nonexistent rug on the floor; Dr. Peschau did not believe that this constituted an attempt to malinger, but could not explain defendant's comment.

Dr. Peschau believed that a criminal defendant has nothing to gain by being found incompetent to stand trial. In any event, Dr. Peschau did not believe that defendant was sophisticated enough to realize he might benefit from malingering.

The People's expert witnesses disagreed with the conclusions of the defense witnesses. Anthony Bitting, Ph.D., a licensed clinical psychologist, concluded that defendant was malingering. He described defendant as feigning a catatonic manner toward him in a jailhouse interview. True catatonia

would manifest itself differently. Later, when defendant thought he was out of Dr. Bitting's sight, he interacted with other inmates normally; when he saw Dr. Bitting watching him, he reverted to his feigned catatonia. Dr. Bitting stated to defendant that he knew defendant was faking symptoms of mental illness, and told the jury that defendant was not mentally ill. He explained to the jury that even "people . . . whose thoughts are very scrambled . . . . know you're there," and that defendant was playacting.

Lay witnesses testified that defendant's behavior in jail was unremarkable. Defendant told one sheriff's deputy that he was glad to be back from the nearby Highland Hospital so he could resume, in the deputy's words, "talking to normal people or something [of] that nature." The deputy also testified that defendant behaved normally during hours reserved for inmates to socialize outside their cells. But he also testified that defendant was kept on a 15-minute suicide watch, a status held by about 1 percent of the inmates at the jail.

There was additional evidence that defendant feigned symptoms of mental illness or low intelligence to try to avoid standing trial. A different sheriff's deputy testified that defendant had filled out a number of jail commissary order forms accurately and legibly. The forms required defendant to write his name, which he did. Earlier, Dr. Palmer had testified that defendant claimed to be illiterate, and that when Dr. Palmer asked him to sign his name, he printed out the letters "t-e-m-o-d."

A third sheriff's deputy confirmed that defendant interacted normally with other jail inmates.

Maurice Beaulieu, M.D., a psychiatrist and the chief of the psychiatric custody facility at Highland Hospital, testified for the prosecution. Defendant had been sent there for evaluation because he had created a noose in jail and was considered a suicide risk. Defendant claimed to be hearing voices and proclaimed himself "King of the world." To determine if he was inventing symptoms, Dr. Beaulieu placed him on Haldol, "a rather potent antipsychotic medication" that should alleviate genuine hallucinations. Haldol had no effect, and Dr. Beaulieu observed defendant interacting normally with the nursing staff but "selectively speaking about voices when speaking with Dr. [Arend] Boer or myself." Dr. Beaulieu concluded that defendant was malingering. He ordered defendant placed on a suicide watch on his return to jail because he was "very invested in looking as sick as he could, and I felt that . . . he might make some kind of suicide gesture where he could make a mistake and actually harm himself."

Arend Boer, Ph.D., a licensed clinical psychologist on the Highland Hospital staff, also testified for the prosecution. He quickly concluded that

defendant was malingering. Defendant "did all kinds of little things that mentally ill people do not do." And defendant "is very street-wise and very prison-wise." Defendant exaggerated abnormal behavior when taking the Minnesota Multiphasic Personality Inventory (MMPI) test. Dr. Boer concluded that defendant "is competent and he is willfully, volitionally thwarting the [penal] process." Dr. Boer testified on cross-examination that defendant might have a degree of mental illness, but that it was secondary to his feigning symptoms to avoid prosecution.

As stated, a jury found defendant competent to stand trial.

### DISCUSSION

Defendant asserts that the trial court's oral instruction to the jury at the competency hearing denied him due process of law and did not conform to subdivision (a) of section 1367, which, at the time of trial, provided: "A person cannot be tried or adjudged to punishment while such person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (As amended by Stats. 1980, ch. 547, § 7, pp. 1509–1510.)[2]

The standard jury instruction based on section 1367 was CALJIC No. 4.10, which, at the time of trial, stated:

"Although on some subjects his mind may be deranged or unsound, a person charged with a criminal offense is deemed mentally competent to be tried for the crime charged against him:

"1. If he is capable of understanding the nature and purpose of the proceedings against him; and

"2. If he comprehends his own status and condition in reference to such proceedings; and

"3. If he is able [to assist his attorney in conducting his defense] [to conduct his own defense] in a rational manner.

"The defendant is presumed to be mentally competent and he has the burden of proving by a preponderance of the evidence that he is mentally

---

[2] The current version of the quoted portion of section 1367 is the same as that in effect when defendant's competency was tried, except that the word "such" has been replaced with the word "that." (Stats. 1992, ch. 722, § 10, p. 3354.)

incompetent as a result of mental disorder [or developmental disability]." (CALJIC No. 4.10 (1984 rev.).)

The trial court instructed the jury in language that, according to the reporter's transcript, differed slightly from the standard jury instruction.[3] The reporter's transcript reflects that the court instructed the jury that "[a]lthough on some subject his mind may be deranged or unsound, a person charged with a criminal offense is deemed mentally competent to be charged with the crime against him, if he is capable of understanding the nature and purpose of the proceedings against him; second, if he comprehends his own status and condition in reference to such proceedings. [¶] If he is able to assist his attorney in conducting his defense in a rational manner, the defendant is presumed to be mentally competent, and he has the burden of proving by a preponderance of the evidence that he is mentally incompetent, as a result of mental defect, or disorder."

The most significant differences between the court's instruction as reflected in the reporter's transcript and the standard instruction are that the word "and" does not appear between the three clauses that are identified by number in the standard instruction and that the period at the end of the third such clause is missing so that this clause becomes part of the next sentence. Defendant relies upon these differences to argue that the instruction was defective because "[i]nstead of instructing the jury in accord with section 1367 and CALJIC No. 4.10 to deem [him] competent to stand trial only if he is capable of understanding the nature of the criminal proceedings *and* assisting counsel in the conduct of a defense in a rational manner, the trial court permitted the jury to find [him] competent if it found *either* of these facts true . . . ."

■ Of course, when the court orally instructs the jury, the court reporter cannot always capture and report the court's intended punctuation. Speakers seldom indicate punctuation as they speak, leaving the court reporter with the always difficult, and sometimes impossible, task of supplying punctuation that reflects the speaker's cadence and inflection. Although we rely upon the court reporter to accurately record the words spoken in court, we are not bound by the court reporter's interpretation of the speaker's intended meaning as shown by the punctuation inserted by the reporter.

In the present case, the trial court read the words of the standard instruction nearly verbatim. But the punctuation supplied by the court reporter suggests

---

[3] The record before us does not reflect that the jury was given written instructions. We reiterate our recommendation that in capital cases trial courts provide juries with written instructions "to cure the inadvertent errors that may occur when the instructions are read aloud." (*People v. Seaton* (2001) 26 Cal.4th 598, 673 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

that the court misread the standard instruction by disregarding the period at the end of the third numbered clause and reading that clause as if it were an introductory clause in the next sentence, which would have altered the instruction's meaning. We are not convinced, however, that the court misread the standard instruction.

As noted above, we are not bound by the punctuation supplied by the court reporter. Because the court clearly was reading a standard instruction, it is far more likely that the punctuation supplied by the court reporter failed to accurately reflect the meaning conveyed by the court's oral instructions than that the court misread the standard instruction. We can conclude with confidence, therefore, that the court read the standard instruction as it was written and did not merge the final two sentences of the standard instruction as reflected in the reporter's transcript.[4] Our conclusion is supported by the fact that the final, merged sentence of the court's oral instruction as reflected in the transcript does not make sense. According to the reporter's transcript, the court instructed the jury: "If he is able to assist his attorney in conducting his defense in a rational manner, the defendant is presumed to be mentally competent, and he has the burden of proving by a preponderance of the evidence that he is mentally incompetent . . . ." It would strain credulity to imagine that the court instructed the jury that defendant is presumed to be competent only if he is able to assist his attorney in conducting his defense. As the record before us demonstrates, the court was well aware that a defendant always is presumed to be competent, not just if he or she is able to assist his or her counsel. Also, whether a defendant is able to assist his or her attorney in conducting the defense is part of the test for determining whether he or she is competent and does not affect the fact that the defendant is presumed to be competent.[5] To give credence to the erroneous punctuation in the reporter's transcript would produce an anomalous result. It would be

---

[4] The dissent is correct that there are three "possible explanations for the differences between the reporter's transcript and the standard CALJIC instruction" (dis. opn. of Kennard, J., *post,* at p. 257): that the court deliberately altered the instruction, that it misread the instruction, or that the court reporter supplied the wrong punctuation. But only the last of these three possible explanations is reasonable. There is nothing in the record to indicate that the trial court deliberately altered the standard instruction without consulting the parties. And we disagree with the dissent that "misreading by the trial court is just as likely as mispunctuation by the reporter." (*Ibid.*) The trial judge was reading from a standard instruction given routinely in trial courts. It is inconceivable that the trial court misread the instruction in the nonsensical manner reflected by the punctuation supplied by the court reporter.

[5] The dissent is correct that, as a general rule, the determination of the accuracy of the reporter's transcript is best decided by the trial court. But we may depart from this general rule when remanding the case for a hearing would only confirm what already is obvious from the record before us; the punctuation supplied by the court reporter did not accurately reflect the meaning of the standard instruction read by the trial court.

illogical to find someone competent who either was incapable of understanding the nature and purpose of the proceeding or unable to assist his or her attorney in a rational manner.

Having concluded that, despite the punctuation supplied by the court reporter, the trial court did not misread CALJIC No. 4.10 by omitting the period at the end of the third numbered clause, it remains that the reporter's transcript reflects that the court omitted the word "and" from between the three numbered clauses. This minor deviation from the text of the standard instruction, however, did not materially alter the instruction's meaning. Even with the word "and" omitted, the instruction the court read adequately conveyed that in order to be deemed mentally competent, defendant must be capable of understanding the nature and purpose of the proceedings against him, comprehend his own status and condition, and be able to assist his attorney.

Moreover, even if the minor variation between the standard instruction and the trial court's instruction created ambiguity, it did not infringe on defendant's due process rights.

█ With regard to criminal trials, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is ' "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." ' [Citation.] ' "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' [Citation.] If the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*Middleton v. McNeil* (2004) 541 U.S. 433, 437 [158 L.Ed.2d 701, 124 S.Ct. 1830].) Assuming for purposes of discussion that this standard applies in a competency trial or other competency proceeding (see *People v. Dunkle* (2005) 36 Cal.4th 861, 899–900 [32 Cal.Rptr.3d 23, 116 P.3d 494]; *People v. Johnwell* (2004) 121 Cal.App.4th 1267, 1274, fn. 5 [18 Cal.Rptr.3d 286]), the question, then, is whether the difference between the standard version of CALJIC No. 4.10 and the version the trial court recited made it reasonably likely that the jury misunderstood the applicable law.

We discern no such reasonable likelihood here. As stated, we believe that the trial court instructed the jury correctly in all material respects, even if it did omit the word "and." The court did not expressly speak in the disjunctive. If the court's instruction, as read to the jury, reasonably suggested otherwise, we believe that the record would reflect expressions of concern by counsel, for it would be illogical for the court to tell the jury it could find defendant competent even if, in essence, he was not capable of understanding that he

was on trial, as long as he yet could somehow assist his attorney in a rational manner. Counsel was aware of the proper instructional language: The prosecutor correctly read the CALJIC instruction in his argument to the jury, and in his responding argument defense counsel agreed with the prosecutor's definition. We cannot believe that counsel would have remained silent had the court delivered an instruction that was obviously illogical. In light of the United States Supreme Court's teaching that a "commonsense understanding of the instructions in the light of all that has taken place at the trial [is] likely to prevail over technical hairsplitting" (*Boyde v. California* (1990) 494 U.S. 370, 381 [108 L.Ed.2d 316, 110 S.Ct. 1190]) during the deliberation process, we consider the arguments of counsel in deciding whether the jury misunderstood the instructions (*People v. Kelly* (1992) 1 Cal.4th 495, 526–527 [3 Cal.Rptr.2d 677, 822 P.2d 385]). There is no reasonable likelihood that the minor departure by the court from the language of the standard instruction in reciting the instruction to the jury caused the jury to misunderstand its duties in a manner that denied defendant his due process rights.

Moreover, even if error had occurred, we would find it to be harmless under either the *Chapman* or *Watson* standards of prejudice. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Accordingly, we need not resolve here which standard of prejudice applies. (Cf. *People v. Johnwell, supra,* 121 Cal.App.4th 1267, 1274–1278 [applying *Chapman* to a constitutionally based claim of error in giving instruction regarding competency]; cf. also *People v. Mickle* (1991) 54 Cal.3d 140, 198 [284 Cal.Rptr. 511, 814 P.2d 290] (conc. opn. of Mosk, J.) [same]; *People v. Medina* (1990) 51 Cal.3d 870, 922 [274 Cal.Rptr. 849, 799 P.2d 1282] (dis. opn. of Broussard, J.) [same]; but see *People v. Marks* (2003) 31 Cal.4th 197, 222 [2 Cal.Rptr.3d 252, 72 P.3d 1222] [applying *Watson* to a claim of error for failing to give a proposed competency instruction that was not constitutionally based].) Turning to defendant's assertion: Although defendant insists that "the competency trial itself was close," the record belies that view. True, defense expert witnesses testified that defendant suffered from impairments that would render him incompetent to be tried. But the weight of that evidence was diminished by their concessions, and the testimony of prosecution expert witnesses, that defendant was striving to feign mental illness. The defense experts conceded that defendant attempted to manipulate their examinations, but testified that despite those efforts they detected genuine mental difficulties in him. Expert witnesses for the prosecution opined that defendant was competent, and there was evidence that defendant acted normally in jail. When defendant testified on his own behalf at the guilt phase, he was lucid, articulate, and fully able to comprehend the proceedings and to reason in light of them. He ably provided a self-justifying account of himself through his testimony, which he tailored to minimize his culpability. It is plain from the

record that defendant had the ability to consult with his counsel with a reasonable degree of rational understanding, and had a rational and factual understanding of the proceedings. For all of these reasons, if error had occurred, we would conclude that it was harmless.

## GUILT PHASE

### GUILT PHASE FACTS

The evidence showed that on March 8, 1986, defendant broke into Sarah Anne Lees's home in Castro Valley, robbed her of her shotgun, and shot her to death with that shotgun from close range. Defendant admitted killing Lees but claimed he did so accidentally.

### I. *Prosecution Case*

The prosecution theorized that defendant broke into Lees's empty house, found her shotgun, ambushed her at her front door when she returned home, tried to rape her, and killed her with the shotgun when she resisted.

Gary Schellenberg, an Alameda County Sheriff's Department sergeant, testified that he and a sheriff's deputy discovered Lees's body. A criminalist testified that the body was alongside a water bed, essentially nude from the neck down. Lees had been shot in the back, and blood was around her, underneath her, and above her head. A trail of blood led from the house's entrance to her head, suggesting she had been dragged. The clothing for her upper body had been pulled over her head and neck. Petroleum jelly was found on her inner thighs. A purse was found on top of the bed, with its contents emptied and scattered about. There was no currency on the premises.

The criminalist also examined Lees's truck, which had been found abandoned. He found a shotgun that belonged to Lees and an opened and partly empty box of ammunition inside, the latter containing 17 live rounds. The shotgun itself had blood on it and was loaded with two live rounds and one round that had been expended. The shotgun operated normally and required a normal amount of trigger pull to discharge—six to seven pounds of force. Lees had been shot from a distance of six to 18 inches from the shotgun's muzzle. Defendant's fingerprint was recovered from the box of ammunition. His fingerprints also were found on a door and a shard of glass, which appeared to come from a window of the residence that had been broken.

A pathologist confirmed that a petroleum-jelly-like substance was found on Lees's left thigh, right leg, and external genitalia, and that she had been shot in the center of her back. The wound traveled upward at an angle of about 30

degrees toward the front of Lees's body. She had incurred a blunt-force injury to her right eye near her nose. Her nose was broken, and she had bruises on the right side of her face and her chin. Her facial bruises could have been caused by a blow from a shotgun or a similar blunt object. The blunt-force head injuries could have caused her to be unconscious for a time. Lees had suffered other injuries, including abrasions on her face, head, and a knuckle. She was still wearing a toe ring, earrings, and a watch, but had no rings on her fingers. Blood was found on her left breast; there was no wound at that site and it could have been left by a hand. On cross-examination, the pathologist testified that the angle of the shotgun wound was consistent with the weapon being parallel to the ground and Lees running forward.

Lees's mother, and a good friend of Lees, Carol Correia Tallon, saw Lees on the day of her death. As was her habit, Lees was wearing a number of items of gold jewelry, including a ring with three diamonds, two thinner rings, a bracelet, and a necklace. A police officer testified that defendant was wearing all of these items when he was arrested.

An Alameda County crime lab criminalist testified that a hair found on Lees's left leg and another hair found on her vulva were consistent with defendant's pubic hair. That did not mean that the hairs necessarily came from defendant; they could have come from another or others whose hairs had the same characteristics.

## II. *Defense Case*

Defendant testified in his own behalf at the guilt phase. He explained that he was part of a California Youth Authority crew doing maintenance work not far from Lees's residence. He had been placed in the Youth Authority's care after pleading guilty to two robberies. On March 7, the day before killing Lees, he had argued with one of his supervisors and had been sent back to the crew bus. The bus was unguarded, and he decided to escape, simply leaving the bus without being observed by Youth Authority officials.

After spending a day, a night, and part of another day wandering or resting, he came upon Lees's house and broke in, seeking refuge from the police and the elements. He thought it was an unoccupied weekend or summer cottage because of its isolated location. He had bypassed other houses because he saw people in them. He did not intend to steal anything when he broke in (thus, defense counsel would later argue, defendant had not committed burglary or felony-murder burglary). Once inside, he found a large bottle of wine and consumed about half of it. He also discovered two marijuana cigarettes and smoked those.

Defendant removed his clothes to nap, fell asleep, and was awakened by the barking of one of Lees's dogs. He saw Lees approach the front door and

quickly donned his clothes, which were lying in the hallway. Until she entered the house, he thought she was a visitor because it was daytime and he did not expect the owners to arrive before nightfall, by which point he had planned to have left the premises.

Defendant hid, but something had aroused Lees's suspicions. Once inside, she went to the bedroom, emerged from it carrying a shotgun, appeared to lock the front door, and peered out a window as if fearful of an outside prowler. Defendant panicked because he thought he could not escape. He "rushed out" from his hiding place and wrested the gun away from Lees. During their struggle, he struck her in the face with his fist and the gun itself. His principal concern was to escape with the gun. He then forced Lees into her bedroom and placed the shotgun on a counter.

A short time later, Lees ran from the bedroom toward the front door. Defendant grabbed the shotgun from the counter and it accidentally discharged. He may have wanted to threaten her with it, but he did not intend to shoot.

Lees collapsed by the front door but defendant did not realize that he had shot her. He thought that she had rendered herself unconscious by colliding with the door. He left the house immediately because he feared that the police might discover him there. Finding no keys in Lees's truck, he returned to the house, upended her purse and took from its now-exposed contents the car keys, $22.00 in cash, and the rings the police would recover later. He took these items and the shotgun to Lees's truck. Not wanting Lees to lie unconscious in her own blood (which, on cross-examination, he insisted he saw only on Lees's face), he moved her body to the bedroom.

Defendant placed petroleum jelly on Lees's body because he wanted her mistakenly to think, when she revived, that he had had sexual intercourse with her. "I was thinking . . . that since she tripped out about giving me the gun, I was wondering how she would trip when she found out that I didn't have sexual intercourse with her, but it seemed like I did."

Defendant drove away. He paused at one point to consider whether he should return to check on Lees's condition, but decided that it was too risky and that she would revive in due course. He did not recall seeing a box of shotgun shells in the back of the truck.

On cross-examination, defendant admitted that after he saw Lees approach the house he could have avoided confronting her by leaving through a sliding glass door. He was unable to explain why he did not do so.

A criminalist for the Alameda County Sheriff's crime lab testified that there was no trace of semen at the crime scene.

A criminalist testified that, in theory, the shotgun could have discharged accidentally if mishandled.

### III. *Prosecution's Rebuttal Case*

A firearms specialist testified that Lees's shotgun did not have an "accumulated trigger pull," meaning that the full amount of force needed to discharge the weapon was required each time the trigger was pulled. Nor did the shotgun have a hair trigger. He tested the shotgun to see if it would discharge accidentally, but he could not make it do so.

### GUILT PHASE ISSUES

### I. Miranda *and* Doyle *Issues*

Defendant claims that his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], were violated by the introduction at trial of parts of a brief conversation that took place between him and law enforcement officers before he invoked his *Miranda* right to counsel. He further claims that presenting this evidence violated his rights to due process and to the assistance of counsel. (U.S. Const., 5th, 6th, & 14th Amends.) He maintains that the trial court erred when it denied a motion to exclude his extrajudicial statements.

At a hearing on the motion, a detective sergeant explained that he and a colleague interviewed defendant in a police interview room after he had been taken into custody. As the sergeant was plugging in a tape recorder to begin the formal interview, he explained that he and his colleague were there because defendant was a suspect in Lees's murder. Defendant spontaneously admitted escaping from the California Youth Authority work detail, but denied any contact with Lees. He then requested a public defender and the formal interview never occurred. Defendant made his statements before his interrogators could administer a *Miranda* advisement to him.

At trial, the detective sergeant related defendant's statements to the jury. In closing argument, the prosecutor brought up the falsity of defendant's statements to argue that defendant was unworthy of belief and that his story regarding Lees's death should be discounted accordingly.

Defendant maintains that permitting the sergeant's testimony violated *Miranda* principles because his statements were elicited during custodial interrogation before he was cautioned. The People counter that because defendant volunteered his statements before any questioning began, no *Miranda* (or Sixth Amendment) violation occurred. We agree.

 Defendants who are in custody must be given *Miranda* warnings before police officers may interrogate them. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 297 [64 L.Ed.2d 297, 100 S.Ct. 1682].) *Innis* explained that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." (*Id.* at pp. 300–301, fns. omitted.)

" 'Clearly, not all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response.' " (*People v. Haley* (2004) 34 Cal.4th 283, 301 [17 Cal.Rptr.3d 877, 96 P.3d 170]; see *People v. Cunningham* (2001) 25 Cal.4th 926, 993 [108 Cal.Rptr.2d 291, 25 P.3d 519].) "[F]ocus[ing] primarily upon the perceptions of the suspect" (*Rhode Island v. Innis, supra,* 446 U.S. 291, 301), we conclude that telling defendant he was a murder suspect did not call on him to confess; rather, the effect should have been, and indeed was, the opposite: Defendant admitted only the obvious (that he had escaped from a work detail) and denied that he killed Lees. Moreover, here as in *Haley,* " '[t]he record does not establish that defendant was subject to "compelling influences, psychological ploys, or direct questioning." ' " (*Haley, supra,* 34 Cal.4th at p. 301.) There was no *Miranda* violation.

Citing the decision in *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], defendant also contends that the trial court erred in admitting evidence that defendant implicitly invoked his right to silence by requesting an attorney. Defendant forfeited this claim by failing to object to the introduction of this evidence at trial. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [64 Cal.Rptr.2d 892, 938 P.2d 950].) In any event, we find no error.

 In *Doyle v. Ohio, supra,* 426 U.S. 610, 618, the United States Supreme Court held that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." "A similar process of reasoning supports the conclusion that comment which penalizes exercise of the right to counsel is also prohibited. [Citations.]" (*People v. Crandell* (1988) 46 Cal.3d 833, 878 [251 Cal.Rptr. 227, 760 P.2d 423].) But this does not mean that it always is error to permit evidence that a defendant exercised his right to counsel.

In *Crandell,* the prosecutor played a tape recording of a police interview with the defendant, conducted shortly after his arrest, during which the defendant said he wanted an attorney. During argument, the prosecutor invited the jury to play the recording during deliberations and listen to the defendant's " 'tone of voice' " when he asked for an attorney, which the prosecutor argued was a " 'flippant response.' " (*People v. Crandell, supra,* 46 Cal.3d 833, 878.) We rejected the defendant's argument that this violated the rule announced in *Doyle*: "Here the evidence of defendant's invocation of the right to counsel was received without objection and the remarks of the prosecutor did not invite the jury to draw any adverse inference from either the *fact* or the *timing* of defendant's exercise of his constitutional right." (*Ibid.*)

The same is true here. The prosecutor relied upon defendant's pretrial denial that he had entered the victim's house and killed the victim to attack his credibility. The prosecutor referred to the fact that defendant asked for an attorney only to show that the interview ended after defendant denied any involvement in the victim's death. (See also *People v. Hughes* (2002) 27 Cal.4th 287, 332, fn. 4 [116 Cal.Rptr.2d 401, 39 P.3d 432] [no *Doyle* error if "the evidence of defendant's assertion of his right [to counsel was not] offered to penalize defendant by illustrating consciousness of guilt, but instead . . . to demonstrate a plan to destroy evidence"].)

In any event, this brief and mild reference to the fact that defendant asked for an attorney did not prejudice defendant. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 66 [17 Cal.Rptr.3d 710, 96 P.3d 30]; *People v. Crandell, supra,* 46 Cal.3d 833, 879.)

## II. *Reliability of Hair Comparison Evidence*

Defendant claims that the trial court erred in permitting the prosecution to introduce evidence that a hair found on Lees's left leg and another hair found on her vulva were consistent with his pubic hair. He maintains that the rulings violated his state and federal constitutional rights to due process of law and that the evidence was substantially more prejudicial than probative (Evid. Code, § 352) because the hair comparison evidence was "completely unreliable."

Defendant did not object on due process grounds below; instead, he interposed objections on the basis of Evidence Code section 352 and the evidence's scientific reliability under the *Kelly-Frye* test (*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye v. United States* (D.C. Cir. 1923) 54 App. D.C. 46 [293 F. 1013]). (See *People v. Leahy* (1994) 8 Cal.4th 587, 594–595 [34 Cal.Rptr.2d 663, 882 P.2d 321] [describing the *Kelly-Frye* test].) "Defendant argues on appeal primarily . . . that

the trial court should have excluded the evidence for the reason asserted at trial—that it was more prejudicial than probative. He also argues that this asserted error violated his right to due process. He may make that argument." (*People v. Partida* (2005) 37 Cal.4th 428, 431 [35 Cal.Rptr.3d 644, 122 P.3d 765].) But on the merits, we conclude that no constitutional error occurred.[6]

█ As defendant concedes, this court has long approved of admitting forensic hair comparison evidence. "Hair comparison evidence that identifies a suspect or victim as a possible donor has been routinely admitted in California for many years . . . ." (*People v. Pride* (1992) 3 Cal.4th 195, 239 [10 Cal.Rptr.2d 636, 833 P.2d 643].) Defendant asserts that "developments in other jurisdictions call into question the introduction of hair comparison evidence against a criminal defendant to prove his guilt," citing at length a Canadian provincial commission report (Kaufman, Ministry of Ontario Atty. Gen., Rep. of the Kaufman Com. on Proceedings Involving Guy Paul Morin (1999) <http://www.attorneygeneral.jus.gov.on.ca/english/about/pubs/morin/> [as of Apr. 10, 2006]), a federal district court decision (*Williamson v. Reynolds* (E.D.Okla. 1995) 904 F.Supp. 1529), a book (Scheck et al., Actual Innocence (2000)), and law review articles (Smith & Goodman, *Forensic Hair Comparison Analysis etc.* (1996) 27 Colum. Hum. Rts. L.Rev. 227; Imwinkelried, *Forensic Hair Analysis etc.* (1982) 39 Wash. & Lee L.Rev. 41). This authority does not convince us to retreat from our observation in *Pride, supra,* at page 239, that "California courts have long assumed that hair comparison evidence of the sort admitted here has some logical bearing on defendant's commission of the charged crimes. [Citations.]"

The criminalist acknowledged in her testimony that the hair comparison evidence was of limited significance. The trial court did not err in admitting it. Accordingly, there was no due process violation.

III. *Effect on Jury of Defendant's Misconduct During the Trial*

Defendant claims that the trial court violated his right to an impartial jury under the Sixth and Fourteenth Amendments to the federal Constitution and article I, section 16 of the California Constitution by denying his motion to voir dire the seated jurors to determine whether his misconduct had prejudiced them.

Defendant misbehaved on several occasions. He telephoned certain jurors from jail. He struck Carolyn Roundey, one of his two defense counsel,

---

[6] Defendant does not renew his *Kelly* (see *People v. Leahy, supra,* 8 Cal.4th 587, 591) claim on appeal.

knocking her to the ground and causing jurors to react in alarm. After the assaultive incident, defendant unsuccessfully moved to voir dire the jurors on whether each could remain impartial.

██ Defendant's claim must be rejected at the threshold in light of *People v. Williams* (1988) 44 Cal.3d 1127 [245 Cal.Rptr. 635, 751 P.2d 901], in which, considering similar events, we upheld the trial court's refusal to permit voir dire to determine if the defendant's disruptive in-court conduct had prejudiced the jury. (*Id.* at pp. 1155–1157.) To be sure, in *Williams* we commented that it might have been useful to voir dire the jury regarding the defendant's conduct, and ruled against him solely on the ground that any error in failing to do so was harmless under the circumstances. (*Id.* at pp. 1156–1157.) But we also noted that "As a matter of policy, a defendant is not permitted to profit from his own misconduct." (*Id.* at p. 1156.) We adhere to that view here. Defendant may not complain on appeal about the possible effect on jurors of his own misbehavior after the jury has been sworn. (*People v. Hendricks* (1988) 44 Cal.3d 635, 643 [244 Cal.Rptr. 181, 749 P.2d 836]; see *People v. Hines* (1997) 15 Cal.4th 997, 1054 [64 Cal.Rptr.2d 594, 938 P.2d 388] [rejecting a claim of juror misconduct on the ground that if any occurred the defendant invited it, and citing with approval the policy statement in *Williams*]; see also *People v. Gomez* (1953) 41 Cal.2d 150, 162 [258 P.2d 825] [during voir dire defendant attempted to escape, causing a commotion; doctrine of invited error applied to reject contention that the trial court should have discharged the jury panel].)

## IV. *Court's Refusal to Excuse Defendant from the Courtroom*

In a claim related to claim III, *ante,* defendant asserts that the trial court violated his rights to due process and to an impartial jury under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution and article I, sections 7, 15, and 16 of the California Constitution when it refused to excuse him from the proceedings at his request. He maintains that the court effectively compelled him to physically disrupt the proceedings before it would excuse him from the courtroom.

██ During voir dire, the trial court at times had permitted defendant to absent himself on request, but it was unwilling to do so during the taking of evidence. Read together, the version of section 977[7] in effect at the time of the

---

[7] At the time, section 977, subdivision (b), provided: "In all cases in which a felony is charged, the accused must be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he shall, with leave of court, execute in open court, a written waiver of his right to be personally present . . . ." (Stats. 1968, ch. 1064, § 1, p. 2064.)

guilt phase trial and section 1043 provide that capital defendants may not voluntarily absent themselves during the taking of evidence at their trials unless they have disrupted the trial and the court has reason to believe the disruptive behavior will continue. As we explained in a decision that postdates defendant's trial, "a capital defendant may not voluntarily waive his right to be present during . . . those portions of the trial in which evidence is taken, and . . . may not be removed from the courtroom unless he has been disruptive or threatens to be disruptive." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1211 [56 Cal.Rptr.2d 49, 920 P.2d 1254].)

The record reflects that, during a phase of the trial at which evidence was being presented, an afternoon court session began with defendant repeatedly asking to be excused from the courtroom. The trial court told defendant to calm down, but he began to utter expletives, which left the court unmoved. Defendant asked, "So I've got to do something physical to get removed?" and, when the court continued to tell him to calm down, struck Roundey. The court suspended the proceedings and ordered defendant removed from the courtroom. The court explained to the jurors: "A defendant cannot stop a trial. If the defendant acts up, I have no choice but to remove him. Unfortunately, I cannot remove him until he acts up, which is part of the problem. If a defendant can stop a trial, all he can do is act up."

As stated in our discussion of claim III, *ante,* defendant cannot complain of the effects of his in-court misbehavior. This forecloses his federal and state constitutional claims. In any event, i.e., on the merits, we review a trial court's actions in controlling a disruptive defendant for an abuse of discretion. (See *People v. Welch* (1999) 20 Cal.4th 701, 774 [85 Cal.Rptr.2d 203, 976 P.2d 754].) None occurred. To be sure, the trial court could have acted sooner to control defendant. Section 1043 permitted the court to remove defendant when he became disruptive, and he had become disruptive before he physically lashed out at his counsel.[8] At defendant's first oral outburst, the court could have sent the jury out of the courtroom and dealt with defendant's demand outside the jury's presence. Or, without excusing the jury, it could have ruled that defendant was being disruptive and excused him, which, with the benefit of hindsight, would have spared the jury from witnessing

---

[8] Section 1043 provides, as relevant here:

"(a) Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial.

"(b) The absence of the defendant in a felony case after the trial has commenced in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases:

"(1) Any case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom."

defendant's assault and the melee that followed among defendant, court personnel, and law enforcement personnel. But the trial court was not required to remove defendant immediately the first time he disrupted the proceedings.

## V. Court's Agreeing to Excuse Defendant from the Courtroom

In an argument that he presents in the alternative to claim IV, *ante,* defendant claims that the trial court violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution (specifically his rights to due process and to confront the witnesses against him), and his rights under sections 977 and 1043 to be present during the trial, when it acceded to his wishes to be excused on certain days.

There was no reversible error and no violation of the Fifth or Sixth Amendments.

First, defendant maintains that the trial court erred in not requiring him to waive in writing his presence during voir dire or other proceedings for which former section 977 did not compel his presence but required a written waiver if he wanted to be absent. (Former § 977, subd. (b), as amended by Stats. 1968, ch. 1064, § 1, pp. 2064–2065.) To the extent that these proceedings occurred before the day on which he disrupted the trial, and to the extent that the court required only oral waivers and did not attempt to obtain them in writing, it erred. (*People v. Garrison* (1989) 47 Cal.3d 746, 782 [254 Cal.Rptr. 257, 765 P.2d 419].) The errors, however, were harmless (*People v. Watson, supra,* 46 Cal.2d 818, 836), because the record makes clear that defendant voluntarily waived his right to be present, if only orally. (*Garrison, supra,* at pp. 782–783; *People v. Ruiz* (2001) 92 Cal.App.4th 162, 169 [111 Cal.Rptr.2d 640].)

Second, defendant complains that the trial court should not have honored his requests to be excused from court sessions involving the taking of evidence at the guilt phase after he assaulted his counsel. As stated, the version of section 977 in effect at the time of the guilt phase trial and section 1043 provide that capital defendants may not voluntarily absent themselves during the taking of evidence at their trials unless they have disrupted the trial and the court has reason to believe the disruptive behavior will continue. From all that appears in the record, the trial court was entitled to conclude, following defendant's assault on his counsel, that defendant would continue to disrupt the proceedings if forced to attend them. Under the circumstances, it did not abuse its discretion in not forcing defendant, following his assault on counsel,

to attend on those days that he did not wish to do so. (See *People v. Gutierrez* (2003) 29 Cal.4th 1196, 1208 [130 Cal.Rptr.2d 917, 63 P.3d 1000].)[9]

Defendant further maintains that, no matter what statutory law may provide, the Fifth and Sixth Amendments to the federal Constitution require the attendance of capital defendants at trial, even if they do not wish to be present. Defendant correctly notes that we have previously rejected this argument. (*People v. Jackson, supra,* 13 Cal.4th 1164, 1210; *People v. Price* (1991) 1 Cal.4th 324, 405 [3 Cal.Rptr.2d 106, 821 P.2d 610].) We adhere to the view we expressed in *Jackson* and *Price.*

### VI. *Adequacy of Record on Appeal*

Defendant claims that the trial court's failure to preserve a complete record for appeal violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution, along with California constitutional, statutory, and court rules provisions. As regards his constitutional claims, he identifies violations of his rights to due process under the Fifth and Fourteenth Amendments and to the equal protection of the laws under the Fourteenth Amendment, along with rights guaranteed by article I, sections 7, 15, 17, and 24 of the California Constitution. His other claims invoke section 190.9, subdivision (a), and, as currently numbered, rule 34.1(a)(2) of the California Rules of Court.

■ If any part of the proceedings was not reported as required by section 190.9, subdivision (a), "[e]rror it was; in the absence of prejudice, however, it is not reversible." (*People v. Freeman* (1994) 8 Cal.4th 450, 509 [34 Cal.Rptr.2d 558, 882 P.2d 249].) " 'A criminal defendant is . . . entitled to a record on appeal that is adequate to permit meaningful review. . . . The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. [Citation.] It is the defendant's burden to show prejudice of this sort.' " (*People v. Heard* (2003) 31 Cal.4th 946, 970 [4 Cal.Rptr.3d 131, 75 P.3d 53].)

Defendant has failed to do so here. He asserts that jury instruction conferences were not reported and cannot be reconstructed, and also that "two sealed reports have been lost, and no one can remember what they contained." Regarding the unreported conferences, "we are able to review the . . . instructions themselves that were the subject of these conferences" (*People v. Welch, supra,* 20 Cal.4th 701, 774) and in this case, as the rest of our decision makes clear, that suffices to permit defendant to prosecute his

---

[9] On one occasion before the assault, defendant also demanded to leave the courtroom and uttered an expletive. It is unclear from the record whether the trial court granted this request, and we do not consider the matter further.

appeal (see also *People v. Freeman, supra,* 8 Cal.4th 450, 510). As for the sealed reports whose content no one can remember, nothing in defendant's appeal permits us to conclude he has met his burden of showing prejudice as a result of any loss of these items.

Accordingly, we find no prejudicial error under state law (*People v. Watson, supra,* 46 Cal.2d 818, 836), nor any prejudicial federal constitutional error (*Chapman v. California, supra,* 386 U.S. 18, 24). Nevertheless, we continue to "emphasize that trial courts should meticulously comply with Penal Code section 190.9, and place all proceedings on the record." (*People v. Freeman, supra,* 8 Cal.4th 450, 511.)

## VII. *Prosecutor's Remarks During Closing Argument*

Defendant claims that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7, 15, and 17 of the California Constitution, were violated by improper remarks the prosecutor made during closing argument. We disagree.

Defendant finds objectionable the following remarks, or categories of remarks, by the prosecutor: (1) a statement in which the prosecutor asked the jury to believe his assertion that defendant was a liar; (2) comments to the effect that defense counsel was aiding defendant in marketing a story to the jury that understated defendant's true culpability; (3) comments that overstated the value of the hair comparison evidence; (4) comments on defendant's invocation of his *Miranda* rights (*Miranda v. Arizona, supra,* 384 U.S. 436); and (5) appeals to religious values in urging a guilty verdict.

Because defendant did not object to, or request that the jury be admonished in light of, any of the foregoing remarks, the claim has been forfeited. As noted, " '[a]s a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 259 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

Defendant maintains that if we find his claim forfeited, then counsel's failure to ask the court to intervene amounted to a denial of his right to the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution and article I, section 15 of the California Constitution.

A claim of ineffective assistance of counsel in violation of the Sixth Amendment entails deficient performance under an objective standard of

professional reasonableness and prejudice under a test of reasonable probability of an adverse effect on the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052].) The *Strickland* standards also apply to defendant's claim under article I, section 15 of the California Constitution. (E.g., *People v. Waidla* (2000) 22 Cal.4th 690, 718 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

"Failure to object rarely constitutes constitutionally ineffective legal representation . . . ." (*People v. Boyette* (2002) 29 Cal.4th 381, 424 [127 Cal.Rptr.2d 544, 58 P.3d 391].) Moreover, "[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068–1069 [99 Cal.Rptr.2d 1, 5 P.3d 68].) These were not situations in which there could be no satisfactory explanation for counsel's failing to object to the remarks of which defendant now complains. For example, counsel could have preferred not to draw the jurors' attention to particular comments by the prosecutor by objecting to them. We cannot find on this record that counsel's performance was deficient.

In any event, the claim is without merit. Except in one instance, it is clear that the remarks were not objectionable. In the one instance in doubt, it is unlikely that misconduct occurred, but if it did, it was de minimis. Thus, there was no prejudice under the applicable ineffective assistance of counsel standard.

■■■ Under federal law, " 'Improper remarks by a prosecutor can " 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.' " ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1204 [32 Cal.Rptr.3d 759, 117 P.3d 476].) Under state law, " 'a prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair.' " (*Ibid.*)

The prosecutor argued, regarding the defense's version of events, "None of this can be true. Please believe me. He has lied through his teeth in trying to sell this story to you." Defendant asserts that by asking the jurors to believe him, the prosecutor acted improperly.

There was no misconduct. The general rule is that improper vouching for the strength of the prosecution's case " 'involves an attempt to bolster a witness by reference to facts outside the record.' " (*People v. Williams* (1997) 16 Cal.4th 153, 257 [66 Cal.Rptr.2d 123, 940 P.2d 710], italics omitted.) Thus, it is misconduct for prosecutors to vouch for the strength of their cases by

invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it. (See, e.g., *People v. Ayala* (2000) 24 Cal.4th 243, 288 [99 Cal.Rptr.2d 532, 6 P.3d 193]; *Williams, supra,* at p. 257; *People v. Medina* (1995) 11 Cal.4th 694, 756–758 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Specifically, a prosecutor's reference to his or her own experience, comparing a defendant's case negatively to others the prosecutor knows about or has tried, is improper. (*Medina, supra,* at p. 758.) Nor may prosecutors offer their personal opinions when they are based solely on their experience or on other facts outside the record. (See *People v. Farnam* (2002) 28 Cal.4th 107, 200 [121 Cal.Rptr.2d 106, 47 P.3d 988]; *People v. Frye* (1998) 18 Cal.4th 894, 975–976, 1018–1019 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

It is not, however, misconduct to ask the jury to believe the prosecution's version of events as drawn from the evidence. Closing argument in a criminal trial is nothing more than a request, albeit usually lengthy and presented in narrative form, to believe each party's interpretation, proved or logically inferred from the evidence, of the events that led to the trial. It is not misconduct for a party to make explicit what is implicit in every closing argument, and that is essentially what the prosecutor did here. Thus, counsel was not ineffective for failing to object to the comment.

Defendant maintains that the prosecutor engaged in misconduct, in violation of his constitutional rights, when he questioned defense counsel's integrity with remarks such as: "Now, [defense counsel] has a tough job, and he tried to smoke one past us," and that counsel "will admit only what he has to admit and no more. He will come in at the lowest price possible."

This, too, was fair comment, and "[n]o misconduct occurred. This case does not involve such forbidden prosecutorial tactics as falsely accusing counsel of fabricating a defense or otherwise deceiving the jury. (*People v. Bemore* (2000) 22 Cal.4th 809, 846 [94 Cal.Rptr.2d 840, 996 P.2d 1152].) The prosecutor simply used colorful language to permissibly criticize counsel's tactical approach. (*Ibid.*; see *People v. Marquez* (1992) 1 Cal.4th 553, 575–576 [3 Cal.Rptr.2d 710, 822 P.2d 418] [upholding reference to defense as 'smokescreen'].) These comments were explicitly aimed at counsel's closing argument and statement, rather than at him personally. We see no improper attack on counsel's integrity." (*People v. Stitely* (2005) 35 Cal.4th 514, 560 [26 Cal.Rptr.3d 1, 108 P.3d 182].)

Defendant asserts that the following remark unduly bolstered the slight value of the hair comparison evidence: "Now, why have we had no reference at all in the defense argument to the pubic hairs that were found, preserved, compared and identified?" It was proper to call the jury's attention to omissions or other deficiencies in defendant's closing argument. "We accord

the prosecutor wide latitude in describing the factual deficiencies of the defense case." (*People v. Cash* (2002) 28 Cal.4th 703, 733 [122 Cal.Rptr.2d 545, 50 P.3d 332].)

As discussed *ante*, at page 198, defendant asserts that the prosecutor committed *Doyle* error (*Doyle v. Ohio, supra*, 426 U.S. 610), improperly using against him his invocation of his *Miranda* rights by arguing, "the defendant then terminated the conversation by demanding a 'PD [public defender],' as he put it." But as we explained, there was no *Doyle* error, and therefore there was no prosecutorial misconduct.

Defendant perceives misconduct in the prosecutor's reference to religious tenets, made through these remarks, which were the prosecutor's final exhortation: "You know, come judgment day this defendant will not have the opportunity to meet Sarah Anne Lees again; but if he did, he'd have but two words to say[,] I'm sorry, assuming he had any conscience. [¶] You folks do have a conscience. So I urge you that whatever you do with this case, come judgment day you don't find yourself in the same position he would be in otherwise. Be true to Sarah. Be true to . . . this defendant. Let the chips fall where they may and do the right thing."

" ' "[T]he primary vice in referring to the Bible and other religious authority is that such argument may 'diminish the jury's sense of responsibility for its verdict and . . . imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions.' " [Citations.]' [Citation.] [¶] Even if the prosecutor's argument was error, such error was harmless. [Citation.] The prosecutor's biblical argument was only a small part of [his] argument, the bulk of which focused on arguing to the jury why it should find that the statutory aggravating factors outweighed the mitigating factors." (*People v. Samuels* (2005) 36 Cal.4th 96, 134 [30 Cal.Rptr.3d 105, 113 P.3d 1125].) Moreover, "our statements clearly condemning prosecutorial reliance on biblical authority in penalty phase closing argument were made in a series of cases filed in late 1992 and 1993. [Citations.] The prosecutor's . . . closing argument predated these decisions." (*People v. Vieira* (2005) 35 Cal.4th 264, 298, fn. 11 [25 Cal.Rptr.3d 337, 106 P.3d 990].) Under the circumstances, we are loath to state definitively that the prosecutor's fleeting references to "judgment day" amounted to misconduct at all. If it was, it certainly was harmless, whether viewed through the prism of federal constitutional law (*Chapman v. California, supra*, 386 U.S. 18, 24) or state law (*People v. Watson, supra*, 46 Cal.2d 818, 836).

In sum, none of the remarks amounted to an instance of prosecutorial misconduct, except, conceivably, the prosecutor's brief mention of a biblical precept. As stated, the lack of merit to defendant's claims forecloses, on this record, any notion that he was denied the effective assistance of counsel.

## VIII. *Claim of Instructional Error Regarding Intent to Kill*

Defendant contends we must set aside the jury's findings that the special circumstance allegations are true because the trial court committed instructional error when, in answer to the jury's question about the significance of the intent element, it gave the jury an erroneous definition of the mental state required for intent to kill. We agree that instructional error occurred, but conclude that it did not result in prejudice. Accordingly, there is no need to set aside the special circumstance findings.

### A. *The Intent-to-kill Requirement*

In 1983, we held that for a felony-murder special circumstance to be found true, subjecting the killer to a death sentence or life imprisonment without possibility of parole (§ 190.2), the prosecution had to prove that the killer intended to kill the victim. (*Carlos v. Superior Court* (1983) 35 Cal.3d 131, 153–154 [197 Cal.Rptr. 79, 672 P.2d 862], overruled by *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306].) Although we later overruled *Carlos v. Superior Court* in *People v. Anderson,* trials for crimes committed in the window period between *Carlos* and *Anderson* are controlled by *Carlos.* (*People v. Ramos, supra,* 15 Cal.4th 1133, 1150; *People v. Fierro* (1991) 1 Cal.4th 173, 227 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) "As to offenses committed after *Carlos* but before *Anderson* . . . due process and ex post facto principles demand that the intent-to-kill requirement apply to any felony-murder special circumstance charged in connection with such offenses." (*People v. Johnson* (1993) 6 Cal.4th 1, 44 [23 Cal.Rptr.2d 593, 859 P.2d 673]; see *In re Baert* (1988) 205 Cal.App.3d 514, 519–522 [252 Cal.Rptr. 418].) "Retroactive application of *Anderson* in these circumstances would deprive defendant of a defense against imposition of the death penalty which the law at the time of the crime plainly permitted." (*Fierro, supra,* at p. 227.)

There is no question that the trial court understood that the intent-to-kill requirement applied in defendant's case. It instructed the jury, for each felony-murder special circumstance, that it must be proved "that the defendant, Michael James Huggins, intended that a human being, to wit, Sarah Anne Lees, be killed."

### B. *The Trial Court Proceedings*

On August 8, 1990, the jury, which was deliberating the case, requested that the meaning of "intent" be clarified. It sent the trial court a note containing these questions: "Is intent only in the act itself, or with the end result[?] ([Example]: Knowing someone is shot but not tending to the

persons best interest [if shot and let her die . . . is itself killing[10]]),” and “Is intent before, during, or after the act[] of crime[?]”

The trial court responded: “[Y]ou can’t X-ray a person’s mind. So how do you find out the intent with which an act is done? [¶] . . . [¶] . . . You can infer the intent from the nature of the act. [¶] In other words, if you act in a certain way, knowing that a result, death, is likely to follow, whether you want to kill or not, you still have the intent to kill because if you act in a certain way, knowing that the result, death, is likely to happen, whether you desire to kill or not doesn’t make any difference. You still have the intent to kill.” The court directed the jurors to apply this definition of intent to the three special circumstance allegations: that defendant committed the murder in the course of, or immediate flight from, burglary, robbery, and rape or attempted rape (§ 190.2, former subd. (a)(17)(i), (iii), and (vii), now subd. (a)(17)(A), (C), and (G)).

The next morning, defense counsel filed a motion to clarify the trial court’s response. He asserted that the court had, in effect, substituted elements of implied-malice murder (see *People v. Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279]) for intentional murder. The court refused to reinstruct the jury on the definition of intent it had given. Thereafter the jury returned its verdicts, including verdicts that all three alleged felony-murder special circumstances were true.

Defense counsel filed a motion for new trial, again arguing that the trial court had instructed the jury according to elements of implied-malice murder and removed the element of intent from the jurors’ consideration as they deliberated the truth of the felony-murder special circumstances. The court responded, “Now, if I said reckless indifference or something, I would agree with you; but I thought I was fairly careful. In other words, if you act a certain way, knowing as a result that death is likely to follow, you . . . have the intent to kill . . . . Whether you desire to kill or not doesn’t make any difference.” Counsel argued, “I think an intent to kill is a desire to have the consequences of death come about.” The court queried, “You have to intend the person being killed?” Counsel replied, “Yes.” The court concluded the matter, declaring, “We don’t agree. The record’s clear.” It denied the motion for a new trial.

### C. *The Court’s Definition Was Flawed, But There Was No Reversible Error Under State Law or Due Process Violation*

Defendant asserts that the definition of intent that the trial court provided in its response to the jury’s question was faulty because it did not follow the

---

[10] These bracketed words were written in a different handwriting from that of the rest of the jury’s question and were not referred to by the trial court in discussing the question.

definition of intent to kill set forth in *People v. Velasquez* (1980) 26 Cal.3d 425, 434 [162 Cal.Rptr. 306, 606 P.2d 341], judg. vacated and case remanded *sub nomine California v. Velasquez* (1980) 448 U.S. 903 [65 L.Ed.2d 1132, 100 S.Ct. 3042], reiterated in its entirety, *People v. Velasquez* (1980) 28 Cal.3d 461 [171 Cal.Rptr. 507, 622 P.2d 952]. We agree that the court's response to the jury's question was flawed, but find no entitlement to relief.

Contrary to defendant's focus on *Carlos v. Superior Court, supra,* 35 Cal.3d 131, this case does not involve *Carlos* error. The trial court knew that *Carlos* governed defendant's case and accordingly instructed on intent to kill. (Cf. *People v. Marshall* (1997) 15 Cal.4th 1, 42 [61 Cal.Rptr.2d 84, 931 P.2d 262].) This disposes of part of defendant's ex post facto-based due process claim, which rests on a factual predicate that the court instructed the jury in the manner it would have if *Anderson,* rather than *Carlos,* were the governing law—a factual predicate that is contrary to the record. The court's response to the jury's question misstated the definition of intent, but the court did not instruct the jury in a manner similar to that in which it would have if *Anderson* had been the law governing defendant's case. The question before us is narrower: Did the court properly instruct on intent? Defendant recognizes that this is the gravamen of the dispute in his reply brief, in which he comments that "[t]he disagreement between [him] and respondent—much like that between defense counsel and the trial court—revolves around the meaning of 'intent to kill.' " That is a correct statement of the posture of the case.

At the time of trial, intent to kill, as required under *Carlos v. Superior Court, supra,* 35 Cal.3d 131, was defined as follows: " 'For a result to be caused "intentionally," the actor must either desire the result or know, to a substantial certainty, that the result will occur.' " (*People v. Velasquez, supra,* 26 Cal.3d 425, 434; *People v. Davenport* (1985) 41 Cal.3d 247, 262 [221 Cal.Rptr. 794, 710 P.2d 861].) The trial court's oral instruction in the present case stated that the jury could find that defendant intended to kill the victim if he "act[ed] in a certain way, knowing that the result, death, is likely to happen." Although the court erroneously used the term "likely" instead of the term "substantial certainty," reversal is not required, as explained below.

The People rely on *Velasquez* and on *People v. Lathus* (1973) 35 Cal.App.3d 466, 470 [110 Cal.Rptr. 921], for the proposition that the trial court's instructions hewed sufficiently close to the required standard for the judgment to be affirmed. We agree. There was error, but no prejudice.

In addressing defendant's claim, we apply the harmless-beyond-a-reasonable-doubt prejudice standard of *Chapman v. California, supra,* 386 U.S. 18, 24. "In our view, . . . instructional errors—whether misdescrip-

tions, omissions, or presumptions—as a general matter fall within the broad category of trial errors subject to *Chapman* review on direct appeal." (*People v. Flood* (1998) 18 Cal.4th 470, 499 [76 Cal.Rptr.2d 180, 957 P.2d 869]; accord, *id.* at pp. 502–503; see *People v. Haley, supra,* 34 Cal.4th 283, 310; *People v. Williams* (1997) 16 Cal.4th 635, 689 [66 Cal.Rptr.2d 573, 941 P.2d 752]; *People v. Osband* (1996) 13 Cal.4th 622, 681 [55 Cal.Rptr.2d 26, 919 P.2d 640] [applying *Chapman* prejudice standard to review of erroneous instruction on special circumstance].) Accordingly, "we proceed to consider whether it appears beyond a reasonable doubt that the error did not contribute to this jury's verdict." (*Flood, supra,* at p. 504.)

It is clear that the trial court's error in using the term "likely" rather than the term "substantial certainty" did not contribute to the jury's finding that defendant intended to kill Lees. The prosecution contended that defendant shot the victim at close range, intending to kill her. Defendant claimed that the gun discharged accidentally. By accepting the prosecution's version, the jury necessarily concluded that defendant intended to kill the victim. The jury was not presented with any version of the facts that required it to determine whether defendant committed an act knowing that it was substantially certain to kill the victim, rather than knowing that it was merely likely to kill her. We find beyond a reasonable doubt that the error did not contribute to the verdict.

We would reach the same conclusion under the dissent's theory of the jury's question, i.e., that the jury was asking if intent to kill could be found if it concluded that defendant accidentally shot Lees but failed to render aid to her afterward. The dissent theorizes, as we understand it, that the trial court failed to recognize the meaning of the jury's question, but gave an answer that misled the jury into thinking that a failure-to-aid scenario could give rise to an intent to kill. We can discern nothing that would suggest that the trial court's erroneous use of "likely" would be taken by reasonable jurors as an implicit endorsement of a failure-to-aid theory. Moreover, even if the jury was misled, the question of prejudice would still turn on the difference between likelihood and substantial certainty. Would the jury have found that defendant thought Lees was not only likely, but substantially certain, to die if he did not summon aid? We conclude beyond a reasonable doubt that this question must be answered in the affirmative. The record discloses unambiguously that Lees was shot squarely in the center of her back at point-blank range, i.e., from a distance of six to 18 inches. The shotgun was bloodied, defendant left a trail of blood on the floor when he dragged Lees back to her bedroom, and blood lay about her body. Given the location and the obviously grievous nature of Lees's wound, the jury would have had to conclude that defendant knew Lees was substantially certain to die unless medical help arrived promptly. In short, the court's instruction, though erroneous, would

not have affected the jury verdict, even if the dissent is correct in characterizing the gravamen of the jury's question.[11]

Defendant urges that *Velasquez*'s definition of intent is too broad and that we have impliedly rejected it in later cases. (*People v. Osband, supra*, 13 Cal.4th 622, 681; *People v. Balcom* (1994) 7 Cal.4th 414, 423, fn. 2 [27 Cal.Rptr.2d 666, 867 P.2d 777]; see also *People v. Harris* (1961) 191 Cal.App.2d 754, 758 [12 Cal.Rptr. 916]; but see *People v. Smith* (2005) 37 Cal.4th 733, 739 [37 Cal.Rptr.3d 163, 124 P.3d 730]; *People v. Colantuono* (1994) 7 Cal.4th 206, 219 [26 Cal.Rptr.2d 908, 865 P.2d 704]; *People v. Davenport, supra*, 41 Cal.3d 247, 262 [all adhering to the *Velasquez* definition]; *People v. Albritton* (1998) 67 Cal.App.4th 647, 659 [79 Cal.Rptr.2d 169]; *People v. Smith* (1997) 57 Cal.App.4th 1470, 1485 [67 Cal.Rptr.2d 604].) He appears to maintain that applying the *Velasquez* definition, when one more favorable to him later came into being, violates ex post facto-based due process principles.

"On its face the ex post facto clause [(U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9)] operates as a check only on the exercise of legislative power, but similar limitations apply to judicial enlargement of a criminal act under principles of due process." (*People v. Brown* (2004) 33 Cal.4th 382, 391 [15 Cal.Rptr.3d 624, 93 P.3d 244].) Invalid ex post facto punishment occurs only when there are "changes in law that (1) retroactively alter the definition of a crime or (2) retroactively increase the punishment for criminal acts." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 640 [128 Cal.Rptr.2d 104, 59 P.3d 174].) Nothing of the sort occurred here; therefore, there was no violation of defendant's due process rights.

We need not decide whether the *Velasquez* formulation still applies. The only reason defendant was entitled to an intent instruction at all is because of ex post facto principles. The intent requirement was later abolished, a change that could not have improved defendant's legal situation. Thus, what counts for ex post facto purposes is the law defining intent at the time of the crime, not what change in that definition may have occurred later, if any did. The *Velasquez* definition of intent clearly applied at that time. (See *People v. Davenport, supra*, 41 Cal.3d 247, 262 [citing *Velasquez* on this point four months before the crime].) Defendant received the most favorable treatment that the law had to offer at that time or, incidentally, at any time since. He cannot have it both ways, which he attempts to do by insisting on an intent charge to the jury (which he received, and which ex post facto rules required)

---

[11] We note that neither the dissent nor defendant contends that the trial court's supposed lack of response to the jury's question regarding whether failure to render aid consitutes intent to kill was, by itself, error. Nor did defendant object at trial on this basis. We do not address this issue.

and a narrower definition of "intent" (which ex post facto principles do not require). Defendant is not entitled now to the benefit of a different definition of "intent" than that which existed when he murdered Lees, even if the definition of "intent" was later narrowed, because now he would not be entitled to an instruction on intent at all.[12]

## IX. Sufficiency of Evidence for Robbery-related Findings

Defendant contends that there was insufficient evidence to convict him of robbery and find true the related felony-murder special-circumstance allegation, in violation of due process guaranties under the Fifth and Fourteenth Amendments to the federal Constitution.

There was sufficient evidence to support the robbery conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of robbery beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].) The same standard applies to review of the claim that there was insufficient evidence to find true the related felony-murder special circumstance. (*People v. Osband, supra*, 13 Cal.4th 622, 690.)

 There was sufficient evidence for a rational trier of fact to convict defendant and find true the special circumstance allegation under the standard stated above. "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) To be convicted of robbery, the perpetrator must intend to deprive the victim of the property permanently. (*People v. Seaton, supra*, 26 Cal.4th 598, 671; *People v. Wader* (1993) 5 Cal.4th 610, 645–646 [20 Cal.Rptr.2d 788, 854 P.2d 80].) Robbery requires the "intent to steal . . . either before or during the commission of the act of force" (*People v. Marshall, supra*, 15 Cal.4th at p. 34), because "[i]f [the] intent to steal arose after the victim was assaulted, the robbery element of stealing by force or fear is absent" (*People v. Webster* (1991) 54 Cal.3d 411, 443 [285 Cal.Rptr. 31, 814 P.2d 1273]). Defendant testified that he wrested the shotgun from Lees, meaning to steal it at the time the struggle ensued, and had no intention of giving it back to her. (See *post*, at pp. 216–217.) The shotgun was later found in the pickup truck that defendant stole from Lees. The prosecution's evidence and defendant's testimony clearly establish that a robbery occurred. A rational trier of fact could conclude only that defendant robbed Lees of her shotgun.

---

[12] Defendant also claims that constitutional rights he discerns to jury trial, fundamental fairness, and a reliable determination of guilt were violated, but he presents no authority in support. We reject those claims, finding them to be without merit.

 The only intent required to find the felony-murder-robbery special circumstance allegation true is the intent to commit the robbery before or during the killing. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1079–1080 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1263 [74 Cal.Rptr.2d 212, 954 P.2d 475].) As explained, there was ample evidence that defendant intended to rob Lees of her shotgun at the outset of the struggle that occurred before he killed her with it. We reject defendant's claim of insufficient evidence to find true the felony-murder-robbery special circumstance.

### X. *Failing to Instruct on Lesser Included Offense*

Defendant contends the trial court erred in failing to instruct the jury sua sponte on theft as a lesser included offense of robbery, which violated his rights to due process of law under the Fifth and Fourteenth Amendments to the federal Constitution, and to a jury trial under the Sixth and Fourteenth Amendments thereof.

 Theft is a lesser included offense of robbery. (*People v. Valdez* (2004) 32 Cal.4th 73, 110 [8 Cal.Rptr.3d 271, 82 P.3d 296].) A criminal defendant has a constitutional right to have the jury determine every material issue presented by the evidence, and an erroneous failure to instruct on a lesser included offense constitutes a denial of that right. To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on an uncharged offense that is less serious than, and included in, a charged greater offense, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged greater offense are present. (*People v. Heard, supra,* 31 Cal.4th 946, 980–981; *People v. Waidla, supra,* 22 Cal.4th 690, 733.)

But this does not mean that the trial court must instruct sua sponte on the panoply of all possible lesser included offenses. Rather, to amplify on *Heard,* " 'such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed.' " (*People v. Hughes, supra,* 27 Cal.4th 287, 366–367, italics omitted.) The classic formulation of this rule is expressed in *People v. Webster, supra,* 54 Cal.3d 411, 443: "When there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of a lesser included offense, the court must instruct upon the lesser included offense, and must allow the jury to return the lesser conviction, even if not requested to do so."

We are not faced with the foregoing situation here. Defendant focuses on the asportation of Lees's jewelry, asserting he formed the intent to take it from her only after killing her. But this argument is beside the point, because whether the stealing of the jewelry (or of any property other than the shotgun) constituted robbery was never litigated. Although the formal robbery charge mentioned jewelry and cash, the state never attempted to prove robbery of those items. The prosecutor did not say in his opening statement that defendant robbed Lees of the jewelry and cash. In closing argument, the prosecutor focused exclusively on the shotgun when discussing robbery. He contended that defendant's tale of "snatching at the shotgun" from Lees before a struggle ensued over it constituted an admission of robbery of the shotgun, but he never argued that the taking of the jewelry and cash constituted robbery. When discussing the jewelry, the prosecutor implied that defendant's intent to steal it arose after Lees's death. Nor did the instructions to the jury describe the property allegedly robbed; the instructions merely listed the elements of robbery. In sum, the state's robbery case rested solely on defendant's theft of Lees's shotgun.

"Robbery," we reiterate, "is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) As noted, to be convicted of robbery, the perpetrator must intend to deprive the victim of the property permanently (*People v. Seaton, supra*, 26 Cal.4th 598, 671; *People v. Wader, supra*, 5 Cal.4th 610, 645–646), and robbery requires the "intent to steal . . . either before or during the commission of the act of force" (*People v. Marshall, supra*, 15 Cal.4th 1, 34), because "[i]f [the] intent to steal arose after the victim was assaulted, the robbery element of stealing by force or fear is absent" (*People v. Webster, supra*, 54 Cal.3d 411, 443). As explained in our discussion of claim IX, ante, even defendant's evidence supports the conclusion that defendant robbed Lees of her shotgun. Defendant testified that he took the shotgun from her as the two struggled, and harbored, from the outset of the struggle, the intent to steal it. The shotgun later was found in the pickup truck that defendant stole from the victim. The evidence points to a sole conclusion: Defendant robbed her of her shotgun.

Defendant asserts that he decided to take the shotgun from Lees only after he assaulted her. But there is no substantial evidence of this possibility. As noted, "[i]f [the] intent to steal arose after the victim was assaulted, the robbery element of stealing by force or fear is absent" (*People v. Webster, supra*, 54 Cal.3d 411, 443), and the offense is theft (*ibid.*). But we read the record differently than does defendant. As alluded to, defense counsel asked defendant, "[w]hen you first got that gun away from her, you had no intention of giving it back to her, did you?" Defendant answered, "[n]o, I didn't." The reasonable interpretation of defendant's admission, read against his description of his struggle with Lees and his eventual carrying of the shotgun to Lees's

truck, is that he intended to take the shotgun from the moment he saw Lees holding it and keep it for himself. As stated, the prosecution's theory of the case also pointed to defendant's intent to steal the shotgun before he attacked and murdered Lees, an assault carried out in part to accomplish the stealing of the shotgun. There was no substantial evidence for the view defendant now offers, i.e., evidence from which a jury composed of reasonable persons could conclude that the lesser offense, but not the greater, was committed. (*People v. Heard, supra,* 31 Cal.4th 946, 980–981; *People v. Hughes, supra,* 27 Cal.4th 287, 366–367.) In sum, "[w]e reject the claim that the evidence of after-formed intent rises to the level of substantial evidence justifying an instruction on theft." (*People v. Sakarias* (2000) 22 Cal.4th 596, 620 [94 Cal.Rptr.2d 17, 995 P.2d 152].) Accordingly, we find no error under state law or violation of any constitutional guaranty.

XI. *Instructing on Rape and Attempted Rape*

Defendant contends the trial court erred in instructing on rape and attempted rape, which violated his rights to due process of law under the Fifth and Fourteenth Amendments to the federal Constitution, and to a jury trial under the Sixth and Fourteenth Amendments thereof.

The trial court originally instructed the jury that nonconsensual sexual intercourse constitutes rape whether the victim is dead or alive. The next day, the court reversed itself and instructed the jury that a completed rape is possible only when the victim is alive, and that an attempted rape is possible only if the attempt began when she was alive.

Defendant argues that constitutional error occurred because the trial court did not directly "repudiate" its instruction that a dead victim can be raped, but retreated from it in an equivocal manner, resulting in an ambiguous charge to the jury.

We do not agree. As stated, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is ' "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." ' [Citation.] ' "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' [Citation.] If the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*Middleton v. McNeil, supra,* 541 U.S. 433, 437.)

With regard to completed rape, it is well established that the offense requires a live victim. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 660 [21

Cal.Rptr.3d 612, 101 P.3d 509].) With regard to attempted rape, "a person who attempts to rape a live victim, kills the victim in the attempt, then has intercourse with the body, has committed only attempted rape, not actual rape, but is guilty of felony murder . . . ." (*People v. Kelly, supra,* 1 Cal.4th 495, 525.)

The trial court effectively told the jury to disregard its earlier instruction that a dead woman can be raped, and correctly stated the standard for determining the truth of the felony-murder-rape special circumstance, stating, "[i]n . . . rereading the transcript, when I spoke to you and answered some of your questions, it came out a little garbled on one issue; and I want to just take a second and talk to you about it. [¶] What I'm talking about is the special circumstance of murder during the commission of a rape or [an] attempted rape. So let me do it again now. [¶] As you know, the special circumstance alleges the murder occurred during a rape or an attempted rape. Now, if the victim is dead before there is any sexual penetration, no matter how slight, the special circumstance of murder during the commission of rape cannot be true. In other words, there has to be sexual penetration before the victim is dead for the special circumstance of murder during . . . a rape to be true. [¶] But the special circumstance of murder during the attempted commission of a rape can be true even if the victim is dead so long as the attempt began before her death. [¶] . . . [¶] So, in other words, if the victim is dead before there's any sexual penetration, the special circumstance of murder during the course of rape is not true; but the special circumstance of murder during an attempted rape can be true even if the victim is dead so long as the attempt began before her death." These were accurate statements of the applicable law, and there is no reasonable likelihood that the jury misunderstood and misapplied the court's corrective instruction. We reject defendant's claim.

## COMPETENCY INQUIRY BEFORE PENALTY PHASE

Defendant claims that the trial court violated his federal and state rights to due process of law by failing to declare a doubt about his competency and to conduct a full competency hearing before the second, and decisive, penalty phase began. He argues that a formal competency hearing was required because a substantial period of time had passed since the previous competency hearings and because defense counsel had expressed concern that defendant's mental health had deteriorated.

### FACTUAL BACKGROUND

The guilt phase trial began on March 26, 1990. In that year, after finding defendant guilty, the jury deadlocked on penalty and the court declared a

mistrial. At the beginning of the second penalty phase, which began on July 22, 1993, the trial court conducted an informal inquiry into defendant's competency to proceed to trial before a new jury. Counsel for defendant stated that he had concerns about defendant's competency. He noted that he, the prosecutor, and the trial judge were all new to the case, and asserted that even though in 1987 and 1990 defendant's competency had been reviewed and no grounds for incompetency found, his mental condition might have deteriorated since then.

The trial court said that to prepare for the inquiry it had read the record of defendant's 1987 competency trial, the experts' reports prepared for that trial, and a three-page evaluation of defendant done by Dr. Boer in 1990. The court also read all of defendant's guilt phase testimony. On the basis of that review, the trial court commented, "I can hopefully make an intelligent decision about whether there has been a substantial change in circumstances or new evidence [to be] presented today . . . ."

On the first day of the informal competency inquiry, George Woods, M.D., a psychiatrist, testified that defendant suffered from various mental health problems, including paranoia and either a schizoaffective disorder or bipolar disorder, which two disorders would produce the same symptoms. He concluded that defendant could not rationally assist counsel to prepare a defense and was incompetent to stand trial. But he conceded that defendant's "psychotic state" had not changed in many years.

Following the parties' examinations, the trial court examined Dr. Woods and asked him whether defendant's lengthy testimony at the guilt phase trial showed that he did not have mental difficulties amounting to incompetency. Dr. Woods initially expressed some doubt about the rationality of some of defendant's testimony at the guilt phase, but ultimately conceded that, particularly with regard to the evidence that he raped or attempted to rape Lees, it served a potentially exculpatory purpose even if some of his statements did not appear to be rational. Dr. Woods agreed, moreover, that defendant appeared to have no cognitive difficulties, no failures of memory, and no difficulties in explaining his conduct, and that he appeared to understand that he was on trial and the nature of a trial.

The trial court ruled that it would apply a substantial-change-in-circumstances test to determine whether it should declare a doubt about defendant's competency. Doing so, it concluded that portions of Dr. Woods's testimony established that there had been no substantial change in defendant's mental condition from 1990, and that Dr. Woods had conceded that in 1990 defendant satisfied the minimum statutory competency requirements. It concluded that there was only a weak basis for Dr. Woods's general opinions

about defendant's current mental condition, given that, among other deficiencies in Dr. Woods's preparation, he had not reviewed critical testimony from defendant's 1987 competency trial. The court also found that the quality of defendant's testimony at the guilt phase produced "powerfully persuasive" evidence of his competency in 1990. Defendant had seriously contested the extent of his criminal culpability, in particular by putting in controversy through his testimony the question whether the special circumstances were true. For the foregoing reasons, the court denied the motion.

## DISCUSSION

" ' "When a competency hearing has already been held and defendant has been found competent to stand trial . . . a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." ' " (*People v. Lawley* (2002) 27 Cal.4th 102, 136 [115 Cal.Rptr.2d 614, 38 P.3d 461].)

We apply a deferential standard of review to a trial court's ruling concerning whether another competency hearing must be held. (*People v. Weaver* (2001) 26 Cal.4th 876, 954 [111 Cal.Rptr.2d 2, 29 P.3d 103].) We review such a determination for substantial evidence in support of it.

Although the fact of the prior competency determination did not by itself establish defendant's competency before the second penalty phase (see *People v. Medina, supra*, 11 Cal.4th 694, 728), a second competency hearing was required only on a showing of a substantial change of circumstances or new evidence casting a serious doubt on the validity of the prior finding (*People v. Lawley, supra*, 27 Cal.4th 102, 136). The prior finding was based on a thorough inquiry into defendant's competency, and the evaluations made at that time and the verdict of competency must be viewed as a baseline that, absent a preliminary showing of substantially changed circumstances, eliminated the need to start the process anew. As the prosecutor argued to the trial court following the testimony at the informal inquiry, the question has "been resolved by a jury trial. [The defense expert] merely disagrees with that result." Defendant failed to show a substantial change of circumstances. Therefore we sustain the trial court's ruling, and conclude that defendant's due process claims lack merit. (*People v. Jones* (1997) 15 Cal.4th 119, 139, 150–151 [61 Cal.Rptr.2d 386, 931 P.2d 960] (plur. opn. of George, C. J.), overruled on another point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

## PENALTY PHASE

### I. Prosecution Case

#### A. Defendant's Prior Street Crimes

At the second and decisive penalty phase trial, Doris Dantes testified that she awoke about 2:00 a.m. one morning in 1981 to find defendant standing on a stepladder and shining a flashlight through her first floor apartment window in San Francisco. The two of them were looking at each other through the window, separated by only a couple of feet. Paralyzed by fear, shock, or both, she was unable to scream; instead, she told him to go away. After unsuccessfully trying to reach a telephone to call police, she fled. As she ran for the front door, defendant hurled a brick through the window, almost striking her, and she was injured by flying shards of glass. Only then did she begin to scream, and she left the apartment and sought help from a neighbor. When she returned later, she found someone else's blood on the window frame and saw that her purse, which had been lying on a couch near the window, was missing. The police escorted her to an area some blocks away where defendant, who had been chased by Dantes's neighbors, had been apprehended in possession of her purse. She identified defendant and her stolen purse. All of her money had been taken from the purse, and credit cards may have been taken as well.

One of the pursuers also testified. In trying to escape, defendant threw his flashlight at the pursuer. Defendant also threatened to take revenge on him as he was holding defendant on the ground and awaiting the police.

Semadar Barzel testified that on an evening in 1984, in San Francisco, she was at her doorstep when an African-American man pointed an object at her (she thought it might have been a toy gun or a knife), grabbed her purse, and ran away. Defendant was arrested the next night, and the registration slip to Barzel's automobile, which had been in her purse, was found on him, along with a .25-caliber gun.

A year later, in 1985, defendant committed two violent purse snatchings in one evening. He resisted arrest and had to be physically subdued. One victim, Regena Mannello, suffered facial injuries, had to be treated by emergency medical personnel, later required reconstructive surgery, and was left permanently injured. The other, Linda Incardine, was also assaulted. Defendant hit her four times to force her to relinquish her purse, causing substantial injuries and emotional trauma.

### B. *Defendant's Conduct in Custody*

Sheriff's deputies testified that on July 24, 1987, they discovered defendant had used a contraband razor blade to cut off his identification tag, and that he had hidden the blade in some paperwork. The blade had been broken away from its retaining device. One of the two deputies further testified that on February 5, 1988, he found a contraband razor blade carefully hidden in the wrapper of what appeared to be an unopened bar of defendant's soap. Another sheriff's deputy testified that on March 25, 1988, he found a contraband razor blade hidden in a container of defendant's baby powder.

A deputy sheriff testified that during the guilt phase of the trial, defendant struck one of his counsel, Carolyn Roundey, who was less than five feet tall and weighed about 90 pounds. (See *ante*, at pp. 200, 202.) Afterward, defendant tried to flee the courtroom, but the deputy restrained him. Roundey suffered a swollen face.

A correctional officer at the Corcoran State Prison testified that in 1992 defendant was involved in a fight there with another inmate.

### C. *Defendant's Prior Convictions*

The prosecution also introduced abstracts of judgment showing that defendant had been convicted of two robberies (§ 211) and assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(1)). (§ 190.3, factor (c).) These convictions arose from the Mannello and Incardine incidents. The convictions all occurred in 1985.

### D. *Victim-impact Evidence*

The jury heard testimony about the impact of Lees's death on her family and the community. She was described as compassionate, loyal, and extroverted. Learning of her death and dealing with the aftermath was extremely traumatic for her survivors. Life in her absence had become difficult for her family, coworkers and friends in a number of respects. The community mourned her death by placing a bronze statue of her at the Pleasanton public library.

### E. *Defendant's Extrajudicial Statement Showing Lack of Remorse*

Two deputy sheriffs testified that defendant told them he had no remorse for killing Lees. One quoted defendant as saying, " 'Don't nobody like me

anyway. If I had it to do again I would do it the same way. I don't have any remorse. If I did have remorse I wouldn't have done it in the first place.' "

## II. *Defense Case*

### A. *Defendant's Testimony*

In testimony similar to that which he gave at the guilt phase before a different jury, defendant described the circumstances of his escape from the California Youth Authority work detail and his wanderings in the rural area that would eventually lead him to break into Lees's house. Unlike at the guilt phase, however, defendant ended his testimony after testifying that he heard Lees's dog barking. The court day ended at that point, and the next day defendant refused to continue to testify, either on direct or cross-examination. He did not testify about the death of Lees. The trial court later instructed the jury that "the defendant's refusal to continue his testimony on direct examination, and his refusal to submit to cross-examination, may be considered by you in evaluating his credibility as a witness."

Before ending his testimony, defendant also testified in response to the evidence in aggravation other than the circumstances of the crimes against Lees. He admitted stealing Doris Dantes's purse and also admitted that he used a brick to break the window to her apartment, but he denied hurling the brick. He minimized his role in stealing from Semadar Barzel without precisely denying that he had committed any crimes against her. He admitted striking Linda Incardine and taking her purse, but denied any interaction with Regena Mannello. He admitted striking Carolyn Roundey in court (see *ante,* at pp. 200, 202, 222); he testified that "we was having all kind of misunderstandings." Roundey also looked too much like the murder victim, a resemblance that he felt served to the detriment of his case. And she persisted in "saying stuff that didn't make no sense." Defendant also admitted to having fought with another inmate at the Corcoran State Prison.

Defendant testified that he had innocent reasons for possessing the concealed razor blades. He needed them to cut paper or trim his hair. The jail would cut his hair only once a month, which was too seldom. He acknowledged that he used a razor blade once to sever his wristband, explaining simply, "I don't wear them."

Defendant denied that he ever made any remarks to sheriff's deputies showing a lack of remorse.

### B. *Other Testimony*

Defendant introduced evidence to try to cast the circumstances of the crime in a light more favorable to him. An expert in the mechanics of human

movement testified that defendant could, if startled by Lees exiting the bedroom unexpectedly, have fired the shotgun accidentally.

Defendant also presented evidence of his difficult childhood in Gloster, Mississippi, through the testimony of various relatives. His mother, an alcoholic of low intelligence who suffered from mental illness and had difficulty with basic tasks like cooking and washing, would neglect him, and he regularly lacked adequate clothing and nutrition. At an early age, however, defendant was moved to San Francisco to be cared for by his extended family. Despite their love for and devotion to him, he was hard to control and fared poorly, skipping school, running away from home, and requiring evaluation by a psychologist, with whom he often would not cooperate. When he was around age 10, his mother, still in Mississippi, retrieved him so she could increase her welfare allotment. He was a "problem child" in Gloster as he had been in San Francisco—rebellious, mistrustful, known to the authorities, and prone to committing thefts and burglaries. Eventually he was placed in foster care. After his mother died in 1973, he became involved in gambling and illegal alcohol sales. His grandfather brought him back to San Francisco when he was 14 or 15 years old.

Gloster, even at the time of defendant's penalty trial, was racially divided by railroad tracks that ran through town; the Ku Klux Klan was active in the area; and life in that part of Mississippi was marked by extreme poverty for members of defendant's family. Yet his brother emerged from the family and social environment in Mississippi unscathed, and testified in effect that defendant brought many of his problems, including in his relationship with their mother, on himself through his quarrelsome nature. As one of defendant's relatives admitted, even when defendant was young "he had a bad mind."

Defendant also presented a mental health mitigation case. Dale G. Watson, Ph.D., a licensed clinical psychologist and a neuropsychologist, testified that defendant was mentally ill, had moderate brain dysfunction, and had a cognitive ability that bordered on mental retardation, with an intelligence quotient in the 70's or 80's. Defendant also was suffering from a personality disorder with manic, paranoid, and antisocial features. A Rorschach test suggested that his thinking processes were psychotic or nearly so. Clinical observations also suggested psychotic thinking: Defendant refused to stick out his tongue, describing it as a "silly" request and, after an hour and a half of prodding about his reasons for refusing, explained that he thought complying would result in a rectal examination, which he did not want to have done. This fear amounted to unpredictable and "bizarre" thinking.

Dr. Woods, the psychiatrist who had evaluated defendant for competency purposes (*ante,* at p. 219), testified before the penalty phase jury about defendant's mental condition. His testimony was similar to Dr. Watson's: Defendant was suffering from psychosis, delusional thinking, and an extreme form of paranoia. He did not believe that defendant was malingering, at least with him.

### III. *Prosecution's Rebuttal Case*

Dr. Boer, the psychologist who had testified earlier about defendant's competency (*ante,* at pp. 188–189), also testified before the penalty phase jury about defendant's mental condition. Much as he had before the competency jury, Dr. Boer testified that defendant was an obvious malingerer. He characterized him as a dangerous, manipulative, and antisocial psychopath who could not be treated. On cross-examination, Dr. Boer agreed that defendant is "not very intelligent." He did not believe defendant to be psychotic. As a rule, a malingerer cannot be psychotic, because people who are psychotic are incapable of malingering and, in any event, feel no need to engage in deceptive conduct of that type.

Dr. Beaulieu, the psychiatrist who had testified earlier about defendant's competency (*ante,* at p. 188), was deceased at the time of the second penalty phase. Dr. Boer testified that Dr. Beaulieu believed defendant to be a malingerer with an antisocial personality disorder. Dr. Boer also testified that California Youth Authority records failed to show any psychiatric problems in defendant during his confinement in its facilities.

### DISCUSSION

### I. *Defendant's Absence from Proceedings*

Defendant claims that the trial court violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution (specifically his rights to due process and to confront the witnesses against him), and his rights under sections 977 and 1043 of the Penal Code to be present during the trial, when it permitted him to absent himself from court sessions during the penalty phase, and that a written waiver he executed on each such occasion did not adequately alert him to his right to be present. We disagree.

The record shows that defendant sometimes preferred not to be present during the taking of evidence or other proceedings at the second penalty phase. The first time he completed the waiver-of-presence form and asked to be excused, the trial court reminded him that it had explained to him in detail seven days earlier, during the pre-penalty-phase competency inquiry, his right

to be present and the potential cost of surrendering that right. The court again engaged in thorough questioning of defendant to ensure that he understood he was surrendering an "important right." It excused him for the rest of the day but cautioned him that because the right is so important, it might not honor any future requests to be absent. In sum, the record shows that the court made an exhaustive effort to protect defendant's right to be present and ensure that his waiver of it was knowing and intelligent. And each time defendant asked to be excused thereafter, the court undertook the same procedure and regularly cautioned the jury not to consider his absence. The court was careful to make sure that defendant was waiving his right to presence in an informed manner. Defendant further argues that he should not have been permitted to waive his presence during the taking of evidence. But even if the court did so and thereby permitted defendant to waive his right to be present in violation of sections 977 and 1043, it simply means, as respondent observes, that defendant was "not deprived of a right, but . . . rather failed to fulfill a statutory obligation. . . . [The Legislature] hardly could have intended that a capital defendant be allowed to stall the proceedings, or have them invalidated, unless he chose to attend them." We agree with respondent's observation.

## II. *Batson-Wheeler Claim*

As we have observed, a different jury from the one that tried the guilt phase heard the second penalty phase trial. Defendant claims that the prosecution, in participating in the selection of the second penalty phase jury, exercised peremptory challenges against African-American prospective jurors in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712], and *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].

 Federal law following *Batson* holds that exercising peremptory challenges solely on the basis of race offends the Fourteenth Amendment's guaranty of the equal protection of the laws (*Miller-El v. Dretke* (2005) 545 U.S. 231, 238 [162 L.Ed.2d 196, 125 S.Ct. 2317, 2324]; *U.S. v. Martinez-Salazar* (2000) 528 U.S. 304, 315 [145 L.Ed.2d 792, 120 S.Ct. 774]), and *Wheeler* holds that such conduct violates defendants' right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution (*People v. Wheeler, supra,* 22 Cal.3d 258, 276–277).

Procedurally, the "three *Batson* steps should by now be familiar. First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by

offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410, 2416].) Excluding even a single prospective juror for reasons impermissible under *Batson* and *Wheeler* requires reversal. (*People v. Silva* (2001) 25 Cal.4th 345, 386 [106 Cal.Rptr.2d 93, 21 P.3d 769].) And although a party may exercise a peremptory challenge for any permissible reason or no reason at all (*Purkett v. Elem* (1995) 514 U.S. 765, 768 [131 L.Ed.2d 834, 115 S.Ct. 1769]; *People v. Jones* (1997) 17 Cal.4th 279, 294 [70 Cal.Rptr.2d 793, 949 P.2d 890]), "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination" (*Purkett, supra,* at p. 768).

In evaluating a trial court's *Batson-Wheeler* ruling that a party has offered a race-neutral basis for subjecting particular prospective jurors to peremptory challenge, we are mindful that " '[i]f the trial court makes a "sincere and reasoned effort" to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*People v. Johnson* (2003) 30 Cal.4th 1302, 1319–1320 [1 Cal.Rptr.3d 1, 71 P.3d 270], overruled on another point as explained *post,* at p. 228, fn. 13; accord, *People v. Silva, supra,* 25 Cal.4th 345, 385–386.) In a case in which deference is due, "[t]he trial court's ruling on this issue is reviewed for substantial evidence." (*People v. McDermott* (2002) 28 Cal.4th 946, 971 [123 Cal.Rptr.2d 654, 51 P.3d 874].) The trial court here made a sincere and reasoned effort to evaluate the prosecution's explanations for its excusing of the prospective jurors and, as we now explain, its ruling that the explanations were satisfactory is supported by substantial evidence. We find no basis for reversal.

The parties and the trial court conferred in chambers to discuss defense and prosecution *Batson-Wheeler* motions. Of course, only defendant's motion is at issue here.

Defendant objected that the prosecution had excluded eight African-American prospective jurors in the course of exercising 15 peremptory challenges. After struggling, along with the parties, over the question whether one of the seated jurors, a Puerto Rican woman, was more properly categorized as Hispanic or African-American, the trial court returned to defendant's motion. Before the court ruled on whether defendant had made out a prima facie case of impermissible discrimination, the prosecutor said, "none of my reasons for excusing any of the [prospective] jurors related to race. [They] [r]elated to what I perceived their attitudes are and their ability to be able to impose the death penalty."

The trial court found a prima facie case of impermissible discrimination, and asked the prosecutor to explain the peremptory challenges.[13]

With regard to the first prospective juror, Mark T., the prosecutor observed that (1) he equivocated about his ability to impose the death penalty; (2) he had witnessed the effects of drug abuse and might be a "wild card on that issue," if the defense presented any drug-related mitigating evidence, as the prosecutor believed it did in the first penalty trial; (3) his mother was a psychiatric social worker and his sister a psychologist; (4) he went to several colleges but graduated from none of them, which "[j]ust kind of gives me the impression that he doesn't follow through with things"; (5) "he also had law-related classes with the law school format. I don't want [him] playing lawyer on the jury"; (6) he expressed surprise that the electorate voted not to retain former Chief Justice Rose Bird on this court in 1986, and "I don't want anybody [with that view of the 1986 election] on my jury in a death penalty case"; (7) another employee in the Alameda County District Attorney's Office knew Mark T. and told the prosecutor he did not think he would be able to vote for death; and (8) the defense asked no questions of him, and "I have a real problem with that, because it's obvious to me that they like him."

With regard to the second prospective juror, Gloria W., the prosecutor observed that (1) she was late to court one day; (2) she had a son the same age as defendant was at the time of the crimes; (3) she did not "mix with the other [prospective] jurors" and came across as unfriendly both to them and to him; (4) she equivocated in numerous respects about the death penalty and, ultimately, the prosecutor doubted she could impose it; (5) her youngest brother had died of a drug overdose and the prosecutor was unsure how she might react to any mitigating evidence of drug usage by defendant; (6) she might have religious scruples regarding capital punishment; (7) "[s]he's training for foster care to take care of 12-year-old boys. And I know in the

---

[13] "In *Johnson v. California*[, *supra*,] 545 U.S. 162 [125 S.Ct. 2410, 2419] . . . , the United States Supreme Court recently reversed our decision in *People v. Johnson* (2003) 30 Cal.4th 1302 [1 Cal.Rptr.3d 1, 71 P.3d 270], and held that 'California's "more likely than not" standard is at odds with the prima facie inquiry mandated by *Batson*.' Because . . . defendant made a prima facie showing, Johnson does not affect our holding here." (*People v. Ward* (2005) 36 Cal.4th 186, 201, fn. 2 [30 Cal.Rptr.3d 464, 114 P.3d 717].)

Respondent argues that the trial court erred in finding a prima facie case of discrimination and urges this court to dispose of defendant's claim by setting aside the trial court's ruling. On this record, however, we are not persuaded that the ruling should be set aside. A finding that a defendant established a prima facie case of improper discrimination is reviewed for substantial evidence. (*People v. Silva, supra*, 25 Cal.4th 345, 384.) We cannot say that the trial court's ruling was unsupported by substantial evidence. At the point the court ruled, the prosecutor had exercised peremptory challenges against eight African-American prospective jurors, and that, in our view, constitutes substantial evidence in the circumstances of this case. (See *Miller-El v. Dretke, supra*, 545 U.S. 231, 266 [125 S.Ct. 2317, 2340].)

last [penalty] trial the defense relied heavily on the defendant's problems back in Mississippi . . . [in] foster situations"; and (8) the defense asked no questions of her.

With regard to the third prospective juror, Ray F., the prosecutor observed that (1) he was born in Berkeley and might share anti-death-penalty views the prosecutor believed to be prevalent there; (2) court security reported that Ray F. had jousted verbally with them; (3) "he was totally against the death penalty as a student"; (4) he might have excessive religious scruples regarding capital punishment; (5) he opposed the electorate's decision not to retain former Chief Justice Rose Bird on this court in 1986; (6) he would find psychological or psychiatric testimony helpful, and "I would prefer people that don't particularly like it if I could find them"; and (7) he had equivocated over the years about the death penalty and, ultimately, the prosecutor doubted he could impose it.

With regard to the fourth prospective juror, Charles S., the prosecutor observed that (1) potential affinities existed between him and defendant because the prospective juror's father was a minister in Mississippi, as the prosecutor believed a grandfather of defendant to be; (2) his children had drug abuse problems; (3) he was not friendly to the prosecutor and the prosecutor did not believe he would get along with other jurors; (4) his son was a career criminal; (5) he had minimized the extent of his own criminal activity, saying he had been arrested for disturbing the peace when instead he had been arrested on a felony charge of trying to draw a firearm on an Oakland police officer (the prosecutor regretted not knowing that information earlier or he would have challenged Charles S. for cause); (6) he equivocated in numerous respects about the death penalty and, ultimately, the prosecutor believed he would never impose it; and (7) the defense asked no questions of him.

With regard to the fifth prospective juror, M.S., the prosecutor observed that (1) he dressed "pretty grubbily" in court and thereby showed "no respect for the entire process"; (2) potential affinities existed between him and defendant because they were both from Mississippi and the prospective juror's father was a farmer in that state, as the prosecutor believed a grandfather of defendant to be; (3) he equivocated in numerous respects about the death penalty and, ultimately, the prosecutor believed he would never impose it; (4) he was not friendly to the prosecutor and the prosecutor did not believe he would get along with other jurors; (5) he inaccurately answered a question concerning whether one of his two sons had been a crime victim; (6) a sister's boyfriend had been charged with murder in Arkansas; (7) he might think that mental illness could warrant a sentence less than death; (8) he believed death penalty appeals take too long; (9) he might have religious scruples regarding capital punishment; and (10) the prosecutor had

driven by his house and saw a wrecked automobile in the driveway, which suggested a certain disorderliness in the prospective juror's life. Moreover, the prosecutor believed that the known attitudes of the remaining prospective jurors made the excusal of M.S. advantageous.

With regard to the sixth prospective juror, George M., the prosecutor observed that (1) he continually wore sunglasses in court and thereby showed "no respect to the system"; (2) he flirted with female prospective jurors and "I don't want . . . a Don Juan on the jury"; (3) he equivocated in numerous respects about the death penalty and, ultimately, the prosecutor believed he would never impose it; (4) he was not friendly to the prosecutor and the prosecutor did not believe he would get along with other male jurors; (5) he did not graduate from high school; and (6) his back problems made him unable to sit or stand for extended periods. Moreover, the prosecutor believed that the known attitudes of the remaining prospective jurors made the excusal of George M. advantageous.

With regard to the seventh prospective juror, V.R., the prosecutor observed that (1) potential affinities existed between her and defendant because they both had children born out of wedlock; (2) she equivocated in numerous respects about the death penalty and, ultimately, the prosecutor believed she would never impose it; (3) she was aloof to other prospective jurors; (4) she inaccurately answered a question concerning whether she had been a crime victim; (5) she might have religious scruples regarding capital punishment; (6) the prosecutor had noticed that her automobile was in a sufficiently dilapidated condition to suggest a certain disorderliness in her life; (7) the prosecutor had watched the prospective juror interact with coworkers at Home Depot and observed that she did not appear to get along with them; and (8) the defense seemed too comfortable with her. "I don't think I could take a chance on her." Moreover, "the one that replaced her[,] who was next on the list when I excused her[,] was another black female . . . who I thought was a much stronger juror and much better for the prosecution. And she is, in fact, on the jury and she's a black woman also."

With regard to the eighth prospective juror, Ethel F., the prosecutor observed that (1) she was elderly and might regard life as too precious; (2) she was not friendly toward him and appeared to be aloof toward the other prospective jurors, but kept smiling at defendant; (3) her career in nursing might make her too compassionate; (4) she might have religious scruples against imposing the death penalty; (5) she might have to leave the jury in midtrial to help an ailing son; (6) she equivocated about the death penalty and, ultimately, the prosecutor believed she would never impose it; and (7) the defense seemed too comfortable with her. Moreover, the prosecutor believed that the known attitudes of the remaining prospective jurors made the excusal of Ethel F. advantageous.

The trial court denied defendant's *Batson-Wheeler* motion. It found the prosecutor's reasons to be genuine and candid and not pretextual, and recited in detail its reasons for so finding. It explained at length that many of the prosecutor's observations of the prospective jurors' demeanors and attitudes matched its own. And it commented that "I do not find that [the prosecutor's] voir dire of the Black [prospective] jurors as opposed to other [prospective] jurors was perfunctory, unsavory, shallow or desultory. [¶] I find it was thorough and lengthy. And his voir dire of Black [prospective] jurors was virtually the same as was his voir dire of other [prospective] jurors."

Given the trial court's well-reasoned and sincere effort to evaluate the nondiscriminatory justifications the prosecutor offered, its conclusions are entitled to deference on appeal. (*People v. Johnson, supra,* 30 Cal.4th 1302, 1319–1320, overruled on another point as discussed *ante,* at p. 228, fn. 13.) Substantial evidence, set forth in detail below in our discussion of defendant's *Miller-El* claim (*Miller-El v. Dretke, supra,* 545 U.S. 231 [125 S.Ct. 2317]), supports the trial court's ruling with regard to each prospective juror. Apart from an inconsequential misstatement of the content of Mark T.'s juror questionnaire, which we ascribe to an innocent misrecollection, we have found nothing in the record contradicting the prosecutor's explanations for his peremptory challenges.[14] To the extent that the record touches on the genuineness of the prosecutor's stated race-neutral reasons for challenging the prospective jurors, it confirms them.[15]

Our discussion requires a further inquiry, but undertaking it does not alter our conclusion. In *Miller-El v. Dretke, supra,* 545 U.S. 231 [125 S.Ct. 2317], the United States Supreme Court held that the defendant had established purposeful discrimination under *Batson.* (*Id.* at pp. 235, 267 [125 S.Ct. at pp. 2322, 2341].)

---

[14] Of Mark T., the prosecutor said, "One of the other things that bothered me about his questionnaire is that while he went to several colleges he never did graduate. Just kind of gives me the impression that he doesn't follow through with things." In fact, Mark T.'s juror questionnaire shows that he attended only the University of California, Davis, did not graduate from it, and had a number of "major[s] or area[s] of special interest."

We also note that whereas the prosecutor stated the defense asked Charles S. no questions, defense counsel did ask him one: whether he had ever been an announcer. Charles S. replied no, and counsel said, "You've got a great voice." But this was not so much questioning as extending a compliment. We do not find the prosecutor's comment to be inaccurate.

[15] Thus it does not matter whether it was reasonable for the prosecutor to doubt the desirability of prospective jurors who were born in Berkeley or were associated with automobiles in less than pristine condition. Absent evidence that being born in Berkeley or linked to dilapidated automobiles is so closely associated with a protected group that they are surrogates for membership in the group and thus arguably impermissible (see *Hernandez v. New York* (1991) 500 U.S. 352, 371 [114 L.Ed.2d 395, 111 S.Ct. 1859] (plur. opn. of Kennedy, J.) [dictum]), the reasons are neutral for *Batson-Wheeler* purposes, and that is all that matters.

Prefatorily, we note that *Miller-El v. Dretke, supra*, 545 U.S. 231 [125 S.Ct. 2317] (*Miller-El*), is an extreme case, in which the evidence of the Dallas County, Texas, District Attorney's Office's practice of improperly challenging African-American prospective jurors on the basis simply of race was overwhelming. The Supreme Court referred to the state's "incredible explanations" (*id.* at p. 264 [125 S.Ct. at p. 2339]), "trickery" (*id.* at p. 260 [125 S.Ct. at p. 2337], and "ruse[s]" (*id.* at pp. 260, fn. 24, 262, fns. 25, 26 [125 S.Ct. at pp. 2337, 2338]). In sum, "the state court's [contrary] conclusion was unreasonable as well as erroneous" (*id.* at p. 266 [125 S.Ct. at p. 2340]) under the very high standard imposed on federal courts reviewing state court death judgments.[16]

In *Miller-El* the court performed a comparative prospective juror analysis, apparently for the first time on appeal. (*Miller-El, supra,* 545 U.S. 231, 239–252 [125 S.Ct. 2317, 2325–2332]; see also *id.* at pp. 278, 285 [125 S.Ct. at pp. 2347, 2351] (dis. opn. of Thomas, J.).) On the basis in part of "the transcript of *voir dire*" (*id.* at p. 241, fn. 1 [125 S.Ct. at p. 2326]; accord, *id.* at pp. 252, 253 [125 S.Ct. at pp. 2332, 2333]), the court in *Miller-El* engaged in "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" (*id.* at p. 239 [125 S.Ct. at p. 2325]) and examined the prosecution's treatment of challenged and accepted prospective jurors who were "similarly situated" (*id.* at p. 246 [125 S.Ct. at p. 2329]). The court explained that prospective jurors may be similarly situated without an exact match between or among them with respect to the reasons that a party gave for challenging them. "None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one." (*Id.* at p. 246, fn. 6 [125 S.Ct. at p. 2329].) But the court did not articulate a minimum standard of similarity at which point the comparisons will begin to be probative.

Assuming without deciding that comparative prospective juror analysis for the first time on appeal is constitutionally required in these circumstances, in which the trial court found a prima facie case of discrimination (see *People v. Cornwell* (2005) 37 Cal.4th 50, 71 [33 Cal.Rptr.3d 1, 117 P.3d 622]; cf. *id.* at pp. 69, 71 [undertaking that analysis even though no prima facie case established, when prosecutor permitted to comment despite the lack of such a case]), we undertake that analysis. Doing so, we find nothing in the record that entitles defendant to relief.

---

[16] "Under the Antiterrorism and Effective Death Penalty Act of 1996, Miller-El may obtain relief only by showing the Texas conclusion to be 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' 28 U.S.C. § 2254(d)(2). Thus we presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.' § 2254(e)(1). The standard is demanding . . . ." (*Miller-El, supra,* 545 U.S. 231, 239 [125 S.Ct. 2317, 2325].)

In *Miller-El, supra,* 545 U.S. 231 [125 S.Ct. 2317], the Supreme Court said of peremptory challenges in state courts that "choices [to exercise them are] subject to myriad legitimate influences, whatever the race of the individuals on the panel from which jurors are selected." (*Id.* at p. 238 [125 S.Ct. at p. 2324].) These influences include matters that "are often the subjects of instinct." (*Id.* at p. 252 [125 S.Ct. at p. 2332].) The court cautioned, however, that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." (*Id.* at p. 239 [125 S.Ct. at p. 2325]; accord, *id.* at p. 248 [125 S.Ct. at p. 2330].) It further stated that failure to engage in any meaningful voir dire examination on a subject a party asserts it is concerned about is evidence suggesting that the stated concern is pretextual. (*Id.* at p. 245 [125 S.Ct. at p. 2328]; accord, *id.* at p. 248, fn. 8 [125 S.Ct. at p. 2330].) In a similar vein, the court stated that "the credibility of reasons given can be measured by 'how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " (*Id.* at p. 246 [125 S.Ct. at p. 2329].) In another component of its discussion, *Miller-El* instructs that if a "stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." (*Id.* at p. 252 [125 S.Ct. at p. 2332].) Finally, the *Miller-El* court thought it fitting to consider, albeit as a less significant factor than the side-by-side comparisons it undertook, the statistic that "the State had peremptorily challenged 12% of qualified nonblack panel members, but eliminated 91% of the black ones." (*Id.* at p. 266 [125 S.Ct. at p. 2340].)

 The fundamental inquiry remains the same after *Miller-El* as before: Is there substantial evidence to support the trial court's ruling that the prosecutor's reasons for excusing prospective jurors were based on proper grounds, and not because of the prospective jurors' membership in a protected group? If so, then defendant is not entitled to relief. In undertaking this inquiry, we note that the question is not whether we as a reviewing court find the challenged prospective jurors similarly situated, or not, to those who were accepted, but whether the record shows that the party making the peremptory challenges honestly believed them not to be similarly situated in legitimate respects. As we have observed, *Miller-El* teaches that if a "stated reason does not hold up, its pretextual significance does not fade because . . . an appeals court, can imagine a reason that might not have been shown up as false." (*Miller-El, supra,* 545 U.S. 231, 252 [125 S.Ct. 2317, 2332].) Accordingly, we confine our inquiry to whether the prosecutor here honestly found pertinent and legitimate dissimilarities between members of the group he challenged and the group he accepted.

Defendant compares 17 prospective jurors (including three African-Americans and two Hispanics) whom the prosecution accepted at various stages against eight African-Americans whom it peremptorily challenged, and argues that the accepted prospective jurors shared characteristics with the excluded African-Americans.

It is true that a number of the accepted jurors had isolated and discrete similarities with the rejected African-American prospective jurors. There are, in fact, dozens of such commonalities. For example, the prosecutor stated that because Mark T., a challenged prospective juror, had witnessed the effects of drug abuse, and the brother of another challenged prospective juror, Gloria W., had died of a drug overdose, they might be unduly swayed by defense evidence involving defendant's use of drugs. Several of the accepted jurors, however, including Lloyd B., Charleen H., Mary S., Holly A., and Richard R., had also witnessed the effects of drug abuse on family members, and one accepted juror, Beverly R., stated that drug usage might be mitigating. The prosecutor also stated that Mark T.'s mother was a psychiatric social worker and his sister a psychologist, and that he and another prospective juror he peremptorily challenged, Ray F., would find psychological or psychiatric testimony unduly helpful. In general, then, the prosecutor implied that people exposed to psychology or psychiatry might give too much deference to testimony regarding mental health issues. Several of the accepted jurors, however, including Beverly R., Willie G., Danielle M., Marion R., Sheila B., Charleen H., Brian H., and Mary S., had had similar exposure, or otherwise indicated they might be receptive to mitigating testimony on mental health issues. The prosecutor stated that Ray F.'s Berkeley background might make him too liberal, but an accepted juror, Dorothy B., apparently once lived in Berkeley. The prosecutor asked her no questions on the subject. As noted, *Miller-El* states that failure to engage in any meaningful voir dire examination on a subject a party asserts it is concerned about is evidence suggesting that the stated concern is pretextual. (*Miller-El, supra,* 545 U.S. 231, 245 [125 S.Ct. 2317, 2328]; accord, *id.* at p. 248, fn. 8 [125 S.Ct. at p. 2330].)[17] The prosecutor stated that he peremptorily challenged George M. in part because he did not graduate from high school. But that was also true of R.G., whom he accepted even though she had only a ninth-grade education. These are but a few examples of similarities found in prospective jurors the prosecutor accepted and African-Americans he challenged.

---

[17] Another criterion, namely that "the credibility of reasons given can be measured by 'how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy' " (*Miller-El, supra,* 545 U.S. 231, 246 [125 S.Ct. at p. 2329]), does not come into play here. (See *Boyde v. Brown* (9th Cir. 2005) 404 F.3d 1159, 1170, 1171 [prosecutor's peremptory challenges based on views about people from " 'certain areas' of Perris," a city in Riverside County, "did not rely on any group-based presupposition."].)

Defendant, relying on *Miller-El*'s teaching that failure to engage in any meaningful voir dire examination on a subject a party asserts it is concerned about is evidence suggesting that the stated concern is pretextual (*Miller-El, supra*, 545 U.S. 231, 245 [125 S.Ct. 2317, 2328]; accord, *id.* at p. 248, fn. 8 [125 S.Ct. at p. 2330]), notes that the prosecutor cited the damaged condition of the automobiles associated with M.S. and V.R., "without asking them a single question about the circumstances of the accidents causing the damage or whether the cars even belonged to them." He is correct that the prosecutor did not question either prospective juror about the automobiles.

Nevertheless, the trial court's ruling that the prosecutor's conduct was within constitutional bounds is supported by substantial evidence. In each case, the prosecutor justified the excusals by stating, either explicitly by giving the ultimate conclusion or implicitly by giving examples, that he believed the prospective jurors he challenged were dissimilar to those he accepted because members of the former group were at least unlikely—and in some cases would be unwilling—to impose the death penalty. The record supports the prosecutor's justifications and provides substantial evidence in support of the court's ruling. To provide a few examples, Mark T. testified, "my feelings are mixed about [capital punishment], yes." He worried about "[t]he idea of disproportionate penalties, inequities, . . . distribution of the penalty . . . ." Gloria W. had written on her jury questionnaire that the death penalty is justified if the crime has been established "without any doubts," a higher standard than the beyond a reasonable doubt standard the guilt phase jury applied. Asked whether it was right for the state to kill, she initially testified, "I don't know whether anyone should take anyone's life, except if it's a matter of self-defense, to defend yourself." She did later state that "I think the state has a right to do that." Still, even on the written record before us, she seemed reluctant to impose the death penalty. Ray F. testified, "I was a student in the 70's, and I think I was probably totally against the death penalty then. And now I'm an older person, and I'm not certain I'm actually for the death penalty or against it." He characterized his prior position as "extreme." Charles S. equivocated about the death penalty, and testified in a manner from which the prosecutor could infer that he was lukewarm about it. It was undisputed that M.S. disported himself arrogantly (wearing a cap and sunglasses in court) and arrived late one day, and thus nothing contradicts the prosecutor's assertion that M.S. appeared to him not to respect the judicial process. Moreover, the prosecutor correctly noted that M.S. mentioned mental illness as a possible reason not to impose a death sentence. George M. testified, "I don't want to be on no jury that's going to kill somebody or convict them for life, anyway." The record of V.R.'s testimony does not contradict any of the prosecutor's observations about her. The prosecutor stated that Ethel F. was not friendly toward him and appeared to be aloof

toward the other prospective jurors, but kept smiling at defendant, and nothing in the record before us contradicts that concern.

We also note that the prosecutor accepted three African-American jurors, which we find here to be "an indication of the prosecutor's good faith in exercising his peremptories." (*People v. Snow* (1987) 44 Cal.3d 216, 225 [242 Cal.Rptr. 477, 746 P.2d 452].) If the prosecutor were filtering prospective jurors by race, presumably he would have challenged Charleen H., an African-American woman of Puerto Rican descent. Charleen H. stated that the justice system is biased against the poor; she opined that "it depends how much money you have, I think, where you go to prison and how you're treated." But Charleen H. also stated that she strongly favored the death penalty. Sheila B., an African-American whom the prosecutor did not challenge peremptorily or for cause, opined that the criminal justice system is "less than just," and amplified on this sentiment by explaining that "our society's inherently racist, it's inherently prejudiced, it's inherently classist. So if you're from a certain class, race, whatever group, you may be unjustly either found guilty, not guilty[,] or things happen to you." But Sheila B. also had a law enforcement background, moderately favored the death penalty in principle, and, stating "I believe it has a place in the judicial process," declared that she would vote for it if it appeared on the ballot. Overall her questionnaire showed her to be thoughtful, sober minded, and analytical. Plainly the prosecutor was looking for prospective jurors bearing a favorable attitude toward his cause, not race or ethnicity, in assessing them.

In sum, the prosecutor gave reasons showing that he honestly viewed the prospective jurors he challenged as not similarly situated, in legitimate respects, to those he accepted. The trial court accepted those reasons, and substantial evidence in the record supports its ruling. On our own review of the record, we think it clear that the prosecutor was looking, without regard to race, for sober-minded jurors who led orderly lives and could impose the death penalty if the evidence warranted it. The prospective jurors, including Hispanics and African-Americans, whom he accepted were of that type, and those he rejected were lacking in the essentially pro-death-penalty qualities he was seeking. Accordingly, we conclude that defendant's *Batson-Wheeler* claim is without merit.

### III. *Victim-impact Evidence*

Defendant contends that the trial court violated his due process rights analogous to the constitutional guaranties against ex post facto laws by admitting victim-impact evidence of his crimes. He failed to raise any objection at trial on this ground, and has forfeited the claim. (Evid. Code, § 353.) In any event, we have rejected this contention (*People v. Brown, supra*, 33 Cal.4th 382, 394–395), and adhere to that conclusion.

Next, defendant contends that the victim-impact evidence ranged beyond the constitutionally permissible, the statutorily permissible, and the scope the trial court authorized. He invokes the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution, sections 7, 15, 17, and 24 of article I of the California Constitution, and Penal Code section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in determining sentence.

The trial court held a lengthy pretrial hearing on the matter. Defendant sought to exclude irrelevant and unduly inflammatory evidence. (Evid. Code, §§ 350, 352.) He agreed that case law permitted introducing evidence of the impact of Lees's death on her family, "a glimpse of the life that the defendant extinguished," including "her personal characteristics, the things they did together, . . . and the hard work that she did," and "the loss to the community." He objected to things that in his view cast no light on the uniqueness of Sarah Lees's death but are common to many deaths, such as the cleaning of the house, the funeral arrangements, and the facts that she would never have children and would not be available to care for her mother in her old age.

The trial court explained in detail that *Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597], and *People v. Edwards* (1991) 54 Cal.3d 787 [1 Cal.Rptr.2d 696, 819 P.2d 436], limited the scope of victim-impact evidence the prosecution could introduce in aggravation. (See *Edwards,* at p. 835 [referring to the "outer reaches of evidence admissible as a circumstance of the crime"].) The court stated that *Edwards* imposed on it an "affirmative duty" to curtail or exclude evidence that "conveys only irrelevant information or inflammatory rhetoric which would divert the jury's attention from its proper role or which would invite an irrational or purely subjective response," and limited the prosecution to evidence tending "to show the uniqueness of the victim, Sarah Anne Lees, a quick glimpse of her life, her personal characteristics and the impact her murder has had on her family and community." It pared the prosecution's witness list from 27 individuals to "seven witnesses, possibly eight." To reduce the emotional impact of the testimony, it directed the prosecution to be more leading on direct examination than is traditionally permitted. "I'm not saying suggestive questions . . . I won't allow those—but leading questions which direct the witness towards specific subject areas . . . and . . . away from areas that are not permitted." And it also directed the prosecution to tell each witness in advance not to offer any opinion about the crimes, defendant, or the proper sentence.

Thereafter, as mentioned, the jury heard testimony about Lees's compassion, loyalty, and extroversion, and the psychological effects of her death on other individuals and the community.

Defendant asserts that some of the testimony falls outside the ambit of what is permitted elsewhere. For example, he argues that in *Cargle v. State* (1995) 1995 OKCR 77 [909 P.2d 806], the court questioned the relevance of testimony that the victim "saved the county thousands of dollars by a personal fundraising effort . . . and was thoughtful and considerate to his family . . . ." (909 P.2d at p. 829.) Under this view, he contends, it was error to allow testimony about Sarah Lees's charitable contributions. But the testimony conformed to what the parties here agreed would be relevant. Moreover, except insofar as defendant asserts that it violated due process to admit evidence whose introduction he opposed below as substantially more prejudicial than probative (*People v. Partida, supra,* 37 Cal.4th 428, 431), his constitutional claims, along with his statutory claim under factor (a) of section 190.3, are forfeited (Evid. Code, § 353) because he failed to raise them in the court below; rather, he was actively involved in shaping the scope of the victim-impact testimony and limited his objections to evidence that might be irrelevant or unduly prejudicial (*id.*, §§ 350, 352).

 In any event, there was no error or violation of any constitutional right in permitting the testimony. "In 1987, the United States Supreme Court held that the Eighth Amendment barred evidence of a murder victim's personal traits and the effect of the murder on surviving relatives. (*Booth v. Maryland* (1987) 482 U.S. 496, 509 [96 L.Ed.2d 440, 107 S.Ct. 2529] (*Booth*); see *South Carolina v. Gathers* (1989) 490 U.S. 805, 811–812 [104 L.Ed.2d 876, 109 S.Ct. 2207] [barring prosecutorial argument on the matter].) Four years later, in *Payne* [*v. Tennessee*], *supra,* 501 U.S. 808, the high court reversed itself, and held that the states could choose to admit evidence of the 'specific harm' the defendant had caused, to wit, the loss to society and the victim's family of a 'unique' individual. (*Id.* at p. 825.) According to *Payne,* the federal Constitution bars such evidence only if it is 'so unduly prejudicial' as to render the particular trial 'fundamentally unfair.' (*Ibid.*) [¶] Shortly after *Payne,* this court held that victim impact evidence is generally admissible as a circumstance of the crime under section 190.3, factor (a). (*People v. Edwards*[, *supra,*] 54 Cal.3d 787, 835–836 . . . .) *Payne* and *Edwards* apply even where, as here, the murder occurred while *Booth, supra,* 482 U.S. 496, was in effect. (*People v. Brown*[, *supra,*] 33 Cal.4th [at pp.] 394–395 . . . .)" (*People v. Stitely, supra,* 35 Cal.4th 514, 565.) "We have reviewed the victim impact evidence admitted at the penalty phase of trial, together with the prosecutor's opening and closing arguments, and conclude the admission of the evidence did not surpass constitutional limits. Family members spoke of . . . how they missed having the victims in their lives." (*People v. Boyette, supra,* 29 Cal.4th 381, 444.) As we have described, various witnesses painted a portrait of Lees as compassionate, loyal, and extroverted, and made clear that

they mourned her loss. The community, too, mourned her death by placing a bronze statue of her at the Pleasanton public library. The testimony, though emotional at times, fell far short of anything that might implicate the Eighth Amendment. It was traditional victim-impact evidence, "permissible under California law as relevant to the circumstances of the crime, a statutory capital sentencing factor." (*People v. Cole* (2004) 33 Cal.4th 1158, 1233 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

### IV. *Evidence of Prior Violent Criminal Activity*

Defendant contends that introducing evidence of three prior unadjudicated criminal incidents under section 190.3, factor (b), violated several of his constitutional rights and rights conferred by state decisional law, as specified below. We do not agree.

 "Before an individual juror may consider evidence of other violent criminal activity in aggravation, he or she must find the existence of such activity beyond a reasonable doubt. [Citation.] There is no requirement, however, that the jury as a whole unanimously find the existence of other violent criminal activity beyond a reasonable doubt before an individual juror may consider such evidence in aggravation." (*People v. Griffin* (2004) 33 Cal.4th 536, 585 [15 Cal.Rptr.3d 743, 93 P.3d 344].)

In each instance at issue here, defendant argues that absent evidence that should have been excluded, there was insufficient evidence of the uncharged crimes to meet the beyond-a-reasonable-doubt standard. In each case, however, we conclude that the evidence he believes should have been excluded was properly admitted, and once it was introduced, a rational juror could have found the essential elements of each unadjudicated crime beyond a reasonable doubt.

### A. *Stealing From Doris Dantes*

In the pretrial notice to defendant of the aggravating evidence it planned to introduce, the district attorney's office included "[t]he incident . . . in which the defendant burglarized the apartment of Doris Dantes . . . and violently resisted his apprehension immediately following that offense . . . ." In moving to exclude the evidence, defendant cited the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, section 190.3, factor (b), and *People v. Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782], in which we held that only violent crimes against people, not property, may be introduced in aggravation as evidence of prior violent criminal activity. (*Id.* at pp. 776–777.) Defendant argued in the court below that there was insufficient evidence for a rational trier of fact to find true beyond a reasonable doubt that

he committed any crimes against any person during the Dantes episode. Denying the motion, the trial court reasoned that, based on its reading of prior testimony, the incident involved a battery and the jury could hear evidence of it under section 190.3, factor (b).

As described more fully in the factual background, *ante,* Doris Dantes testified that she awoke to find defendant standing on a stepladder and shining a flashlight through her first floor apartment window in San Francisco. The two of them were looking at each other through the window, separated by only a couple of feet. She was unable to scream, but told him to go away. After unsuccessfully trying to grab a telephone to call police, she fled. As she ran for the front door, defendant hurled a brick through the window, almost striking her, and she was injured by flying shards of glass. Then she began to scream, left the apartment, and sought help from a neighbor. When she returned later, she saw that her purse was missing. A neighbor who pursued defendant also testified. In trying to escape, defendant threw his flashlight at him. Defendant also threatened to take revenge on the neighbor, who was holding defendant on the ground, while they awaited the police.

Defendant maintains that under *People v. Boyd, supra,* 38 Cal.3d 762, 776–777, evidence of the incident was inadmissible because the episode involved only violence against property, namely an effort to obtain Dantes's purse by breaking a window with a brick. He discerns violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as error under *Boyd.* We do not agree.[18] First, from Dantes's testimony, a rational jury could have decided that defendant committed robbery when he threw the brick at Dantes to force her to abandon her purse, and then entered the apartment and stole the purse. Robbery may be accomplished when fear prevents a victim from retaining possession of property within her reach that she could have retained absent the robber's intercession. (*People v. Frye, supra,* 18 Cal.4th 894, 955.) Second, he threw his flashlight at a neighbor in

---

[18] Defendant did not raise a Fifth Amendment claim before the trial court and has failed to preserve it for review. (Evid. Code, § 353.) As we stated in *People v. Partida, supra,* 37 Cal.4th 428, 435, " 'the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.' [Citation.] What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial." (See also *People v. Lilienthal* (1978) 22 Cal.3d 891, 896 [150 Cal.Rptr. 910, 587 P.2d 706].) That is what defendant attempts to do here, but without success. He has forfeited his Fifth Amendment claim.

pursuit of him. That is assault. (§ 240.) The incident fell squarely within factor (b) of section 190.3, and evidence of it was properly admitted.

### B. *Robbing Semadar Barzel and Regena Mannello*

In the pretrial notice to defendant of the aggravating evidence it planned to introduce, the district attorney included "[t]he incident . . . in which the defendant robbed Semadar Barzel of her purse and contents . . ." and the separate incident of an assaultive purse-snatching robbery that injured Regena Mannello. Rejecting a challenge that introducing evidence of the Barzel incident would violate defendant's Fourth Amendment rights because the evidence was obtained by means of an unlawful detention, the trial court permitted the prosecution to introduce the evidence. Defendant renews his Fourth Amendment claim on appeal. He maintains that the police lacked sufficient reason to justify an investigative stop and detention. Without the evidence obtained from that stop, he contends, there was insufficient evidence for a rational trier of fact to find true beyond a reasonable doubt that he committed any crimes against Barzel.

In a pretrial proceeding in this case, a police officer testified that he and his partner detained defendant after they observed him loitering at night in a crime-ridden residential neighborhood for an extended period, perching on the trunk of a parked automobile, entering an automobile from the passenger side before attempting to drive it away (the police later learned that he was trying to steal it), and following both a woman and a police officer (who may have been dressed in plain clothes) in a suspicious manner, as if stalking them. Pursuant to the detention, the officer performed a patdown search on defendant and felt a hard object. At that point, defendant fled and was tackled by the police, who recovered a gun.

Assuming for purposes of argument that the Fourth Amendment may be invoked in an attempt to exclude evidence the prosecution wishes to present solely at a capital sentencing proceeding (but see *U.S. v. Ryan* (10th Cir. 2001) 236 F.3d 1268, 1271 [ordinarily "the exclusionary rule does not bar the introduction of the fruits of illegal searches and seizures during sentencing proceedings"]), it is plain that the police had sufficient cause to detain and question defendant. "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. [Citation.] While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. [Citation.] The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity.

[Citation.] [¶] . . . An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. [Citation.] But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations . . . ." (*Illinois v. Wardlow* (2000) 528 U.S. 119, 123–124 [145 L.Ed.2d 570, 120 S.Ct. 673], fn. omitted.) In making such a stop, police may conduct "a protective patdown search for weapons." (*Id.* at p. 121.)

The circumstances here justified an investigative detention of defendant. He was following a woman and a police officer in a suspicious manner; he was loitering in a high-crime residential area at night; and he entered a car in a peculiar manner and then tried to drive it away. "Lurking in the dark by residences in the wee hours of the morning is unusual for law-abiding persons" (*Battle v. State* (Fla.Dist.Ct.App. 2004) 868 So.2d 587, 589), and "the officer[s] had reasonable suspicion that appellant was loitering and prowling" (*ibid.*). In *Terry v. Ohio* (1968) 392 U.S. 1, 6 [20 L.Ed.2d 889, 88 S.Ct. 1868], the court noted the defendant's "measured pacing" and "peering," similar to defendant's conduct before the officers detained him. The evidence of the Barzel robbery was properly admitted.

## C. *Robbing Linda Incardine*

In the pretrial notice to defendant of the aggravating evidence it planned to introduce, the district attorney's office included "[t]he incident . . . in which the defendant assaulted and robbed Linda R. Incardine . . . ." Defendant moved to exclude evidence that Incardine identified him as the robber, arguing that the procedure used to have her identify him was unduly suggestive, in violation of the Sixth Amendment to the federal Constitution.

When defendant assaulted Incardine, he was wearing a blue sweatshirt with the hood up, which she had a further opportunity to observe as he fled up the street in her view. In a pretrial proceeding in 1990 at which Incardine also identified defendant in court, she testified that officers took her to where they had arrested him and asked her if she recognized him. At the arrest scene, she asked to have him raise his sweatshirt hood, and once he did, she positively identified him.

The trial court denied the motion to exclude the identification, ruling that the identification procedure was constitutionally sound.

Defendant asserts that the identification procedure violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and that

without the identification evidence there was insufficient evidence for a rational trier of fact to find that he assaulted and robbed Incardine. We do not agree that any Sixth Amendment violation occurred.[19]

"In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.] [¶] The defendant bears the burden of demonstrating the existence of an unreliable identification procedure." (*People v. Cunningham, supra*, 25 Cal.4th 926, 989.)

Defendant has not met his burden of establishing unreliability. Incardine identified defendant by his distinctive clothing and his general description within an hour after he assaulted and robbed her. She had a good opportunity to view his clothing as he fled. As she had done in 1990 during a pretrial proceeding, she identified him in court without hesitation. The foregoing indicia of reliability sufficed to make the identification evidence admissible. (See *People v. Cunningham, supra*, 25 Cal.4th 926, 990.)

### D. *Defendant's Jailhouse Statement Showing Lack of Remorse*

The district attorney's office notified defendant that it would use against him his statement to Alameda County Sheriff's deputies that he felt no remorse for killing Lees and would repeat the crime if given the opportunity. Defendant opposed the statement's prospective admission, arguing that doing so would violate the Fifth and Sixth Amendments to the federal Constitution and Evidence Code section 352. The trial ruled that the statements could be admitted. Defendant argues that his extrajudicial statement should have been excluded because it was procured in violation of his Fifth Amendment right to remain silent and to counsel while under custodial interrogation (*Miranda v. Arizona, supra*, 384 U.S. 436) and his Sixth Amendment right not to be interrogated outside counsel's presence (see *Massiah v. United States* (1964) 377 U.S. 201, 205–207 [12 L.Ed.2d 246, 84 S.Ct. 1199]). We do not agree.

In an in limine hearing on the admissibility of defendant's statement, Alameda County Deputy Sheriff Allen Boyd testified that on May 16, 1991,

---

[19] Defendant's Fifth and Eighth Amendment claims are forfeited for the reasons stated in footnote 18, *ante,* at page 240.

he and Deputy Lavada Spence were escorting Huggins to court. According to Boyd, defendant asked Spence if she would applaud if he were given the death penalty, and she said she would. Defendant and Spence briefly engaged in a mild squabble, and Boyd commented, "I see you're still making friends." Defendant replied, according to Boyd, "Don't nobody like me anyway, and if I had it to do again I'd do it the same way. I don't have any remorse. If I did have remorse, I wouldn't have done it in the first place."

Spence testified to the same effect, and explained that the conversation in question had been precipitated because she had clapped in defendant's presence when another jailer pointed out to defendant that he was a convicted criminal. Spence clapped because she was happy defendant had been convicted. No *Miranda* warnings preceded the conversation among her, Boyd, and defendant.

The jailer to whom Spence was referring, Alameda County Sergeant Gary Schellenberg, testified that defendant's behavior had irritated him and he told defendant he was glad defendant was facing the death penalty and hoped defendant would receive a death sentence. Schellenberg, who had discovered Lees's body at the crime scene (*ante,* at p. 194), denied making his comments in an effort to provoke defendant into an admission; he was merely taking out his frustration on him. Defendant denied that the conversation with Spence and Boyd ever occurred. After the court ruled that the testimony was admissible, Boyd and Spence testified before the jury to the same effect as their in limine testimony.

As we stated in our prior discussion of a *Miranda* claim, " 'Clearly, not all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response.' " (*People v. Haley, supra,* 34 Cal.4th 283, 301; see *People v. Cunningham, supra,* 25 Cal.4th 926, 993.) Defendant initiated the conversation by asking Spence if she would applaud if he received the death penalty. "Focus[ing] primarily upon the perceptions of the suspect" (*Rhode Island v. Innis, supra,* 446 U.S. 291, 301), we conclude that nothing in the exchanges that followed suggests that the sheriff's deputies made any statement that might reasonably be construed as calling for a response that might reflect unfavorably on defendant in later trial proceedings.

 Defendant's *Massiah* claim also lacks merit. The Sixth Amendment to the federal Constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This right "attaches ' "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge,

preliminary hearing, indictment, information, or arraignment." ' [Citation.] After it both attaches and is invoked, any incriminating statement the government deliberately elicits from a defendant in counsel's absence is inadmissible at that defendant's trial. [Citations.]" (*People v. Slayton* (2001) 26 Cal.4th 1076, 1079 [112 Cal.Rptr.2d 561, 32 P.3d 1073].) " 'The question here is whether under the facts of this case a Government agent "deliberately elicited" incriminating statements . . . within the meaning of *Massiah*'. . . ." (*Fellers v. United States* (2004) 540 U.S. 519, 524 [157 L.Ed.2d 1016, 124 S.Ct. 1019].) "This inquiry is objective and does not focus on the subjective intentions of the state officer." (*Beaty v. Stewart* (9th Cir. 2002) 303 F.3d 975, 991.)

We conclude that the officers did not deliberately elicit incriminating statements from defendant. "The Sixth Amendment is violated only by deliberate action, not 'whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached.' " (*Beaty v. Stewart, supra*, 303 F.3d 975, 991.) At most, Spence needled defendant by clapping in his presence when Schellenberg commented on his conviction and the possible punishment. This may have been provocative, but it was not calculated to elicit incriminating statements, and defendant made none. Later, defendant began a conversation, outside Schellenberg's presence, by asking if Spence would applaud again if he received the death penalty, and she said she would. It was only at that point that he volunteered a statement that could be used in aggravation. Spence merely replied to defendant's question and did not, in our view, solicit any response. In sum, at no point did defendant's jailers "intentionally create[] a situation likely to induce [him] to make incriminating statements without the assistance of counsel." (*People v. Frye, supra*, 18 Cal.4th 894, 993.)

### E. *Statute of Limitations on Discovery of Razor Blades*

The district attorney's office notified defendant that it planned to introduce aggravating evidence of certain unadjudicated violent criminal activity (§ 190.3, factor (b)); namely, evidence of the incident "occurring on or about July 24, 1987, in which the defendant was [caught] in possession of a razor blade in the North County Jail in Oakland, California . . . ," a violation of section 4574, subdivision (a). The notice alleged that similar incidents occurred on or about February 5 and March 25, 1988. Defendant sought to exclude the evidence, contending that the alleged incidents had transpired so long ago that he was denied his due process rights because he could not properly defend against the charges—e.g., any razor blades that may have been confiscated were no longer available for examination regarding their potential for abuse. The court disagreed and ruled against him. Thereafter, as noted, sheriff's deputies testified about three occasions on which they found

defendant possessed contraband razor blades, and defendant testified that he had innocent reasons for possessing them.

Defendant argues that all three incidents were stale at the time of trial and the statute of limitations to prosecute him for them had expired. He contends that to introduce evidence of them violated his right to due process under the Fourteenth Amendment to the federal Constitution and to a reliable penalty determination under the Eighth Amendment thereto. He has failed to preserve his Eighth Amendment claim for review. (See *ante,* at p. 240, fn. 18.) In any event, both claims are without merit.

"In *People v. Rodrigues* (1994) 8 Cal.4th 1060 [36 Cal.Rptr.2d 235, 885 P.2d 1], we concluded that the admission of violent criminal conduct occurring many years before the penalty trial is not necessarily inconsistent with a defendant's rights to due process, a speedy trial and a reliable penalty determination. We reasoned that 'the state has a legitimate interest in allowing a jury to weigh and consider a defendant's prior criminal conduct in determining the appropriate penalty, so long as reasonable steps are taken to assure a fair and impartial penalty trial.' (*Id.,* at p. 1161.) We identified those 'reasonable steps' as including notice of the evidence to be introduced, the opportunity to confront the available witnesses, and the requirement of proof beyond a reasonable doubt. When these steps have been taken, we concluded, the remoteness of the offense affects its weight, not its admissibility. (*Ibid.*)" (*People v. Yeoman* (2003) 31 Cal.4th 93, 136–137 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

So it is here. Defendant acknowledges our precedents, but urges a different result in his case because the razor blades were not available for inspection. We disagree. The incident reports contained ample information about the incidents. Furthermore, the witnesses' testimony provided a full opportunity for cross-examination, and defendant availed himself of it. Finally, each juror was instructed not to consider any of the alleged incidents in the calculus of penalty unless he or she concluded individually that the prosecution had proved it beyond a reasonable doubt (see *People v. Griffin, supra,* 33 Cal.4th 536, 585). We adhere to our prior conclusions. (See *People v. Yeoman, supra,* 31 Cal.4th 93, 136–137.)

## V. *Impeaching Mental Health Expert With Defendant's Statement*

Defendant claims that his rights under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution, along with sections 15 and 16 of article I of the California Constitution (specifically his rights not to be a witness against himself and to counsel), were violated when the prosecution impeached his expert witness on mental health with his prior extrajudicial

statement, made when he was being evaluated for competency to proceed to trial, about certain circumstances of the crime.

On December 1, 1986, defendant told Dr. John Peschau, a psychiatrist who was examining him to determine his competency (*ante*, at p. 187), that he was surprised by the charges against him and that the victim "shouldn't have got in the way of a good robbery. All I wanted was the cocaine. What I used was an Uzi type shotgun, automatic. When I get out I'm going to get a machinegun for all those people."

During the first trial, in 1990, defendant moved for an order to prohibit the prosecution from impeaching him with any statements he made to Dr. Peschau in the course of the court-ordered competency examination. He cited, inter alia, *People v. Arcega* (1982) 32 Cal.3d 504 [186 Cal.Rptr. 94, 651 P.2d 338], and the Fifth and Sixth Amendments to the federal Constitution. The trial court granted the motion.

At the second penalty phase, in 1993, defendant made a similar but not identical motion, to a different judge (the Hon. Jeffrey W. Horner) from the judge who oversaw the guilt phase (the Hon. Stanley Golde). This time he argued that because the evidence had been obtained in the course of evaluating his competency, rather than in connection with criminal proceedings, it was irrelevant and substantially more prejudicial than probative. (Evid. Code, §§ 350, 352.) He contended that the facts of the crime belied his comments and that he was not presenting a defense to the crimes, which had already been adjudicated, or a case in mitigation based on temporary insanity at the time of the crimes; instead, his case in mitigation was that his actions were the product of long-standing mental defects.

The trial court ruled that it would be improper "to restrict the ability of the district attorney to cross-examine [mental health expert witnesses] as to all information that has some relevance to their opinions." It denied the motion.

Thereafter, the prosecutor asked defendant's psychiatric expert witness, Dr. Woods (see *ante*, at p. 219), if the statement, which the prosecutor quoted to the jury, showed a goal-oriented and coherent mental state.

Defendant does not renew his state law arguments of irrelevance and undue prejudice (Evid. Code, §§ 350, 352). As for his constitutional claims, he failed to present them to the different judge who was overseeing the second penalty phase. He did not call the court's attention to the written motion he had filed on this question during the guilt phase three years earlier, and the record does not show that the court was aware of any basis for his motion other than the relevance and undue prejudice provisions of Evidence Code

sections 350 and 352. He has, accordingly, failed to preserve them for review. A motion to exclude evidence, like an oral objection in open court to the admission of evidence, must "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the . . . party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. . . . A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida, supra*, 37 Cal.4th 428, 435; see *People v. Lilienthal, supra*, 22 Cal.3d 891, 896.)[20]

Defendant argues that if we find his Sixth Amendment claim forfeited, counsel's failure to raise it before Judge Horner constitutes ineffective assistance of counsel. We disagree.

As noted, a claim of ineffective assistance of counsel in violation of the Sixth Amendment entails deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of an adverse effect on the outcome. (*Strickland v. Washington, supra*, 466 U.S. 668, 687–688, 694.) The *Strickland* standards also apply under article I, section 15 of the California Constitution. (E.g., *People v. Waidla, supra*, 22 Cal.4th 690, 718.)

As *Strickland* makes clear, to be entitled to relief on the ground of ineffective assistance of counsel, defendant must show both deficient performance and resulting prejudice. (*People v. Mayfield* (1993) 5 Cal.4th 142, 199 [19 Cal.Rptr.2d 836, 852 P.2d 331].) Accordingly, we need not decide

---

[20] On the merits, defendant argues that, as we have most recently said in *People v. Dunkle, supra*, 36 Cal.4th 861, "statements that a defendant makes in the course of a mental competency examination pursuant to section 1369 may not be used in a trial on the question of his guilt." (*Id.* at p. 905.) A departure from this rule is a violation of the Fifth Amendment. (*People v. Arcega, supra*, 32 Cal.3d 504, 523.) He asserts that the *Arcega* rule applies to sentencing determinations as well. He further argues that his case is indistinguishable from *People v. Harris* (1987) 192 Cal.App.3d 943 [237 Cal.Rptr. 747], in which the Court of Appeal held, "in the event the prosecution wishes to rebut defense testimony concerning the defendant's mental capacity to commit an offense, the prosecution must conduct a psychiatric examination using psychiatrists or psychologists other than those who examined the defendant for the purposes of determining competency to stand trial." (*Id.* at p. 949.) His Sixth Amendment right-to-counsel claim rests on *Satterwhite v. Texas* (1988) 486 U.S. 249 [100 L.Ed.2d 284, 108 S.Ct. 1792], and *Powell v. Texas* (1989) 492 U.S. 680 [106 L.Ed.2d 551, 109 S.Ct. 3146]. As stated in *Powell*, "once a capital defendant is formally charged, the Sixth Amendment right to counsel precludes [a psychiatric] examination without first notifying counsel that 'the psychiatric examination [will] encompass the issue of their client's future dangerousness.' " (*Powell, supra*, 492 U.S. at p. 681, first bracketed material added here, second in *Powell*.) Defendant asserts that he did not enjoy the protection conferred by the Sixth Amendment when the court ordered his competency examination, and thus his statements suggesting future dangerousness could not be introduced in evidence against him. Because he has forfeited his Fifth and Sixth Amendment claims, however, we express no opinion on the merits of these arguments.

whether counsel's performance was deficient. Whether it was or was not, we discern no prejudice to defendant. The evidence that was presented to the jury was insignificant. Though the prosecutor's reference to Dr. Peschau's interview did not flatter defendant, it was brief and pointed as much to an individual in the grip of delusions as to one who realistically posed a serious continuing menace if he should somehow be set free. (Cf. *People v. Arcega, supra*, 32 Cal.3d 504, 525–526.) The jury knew defendant never would be in a position to obtain and fire a machine gun no matter what verdict it might reach. Moreover, the other aggravating evidence was strong, including the circumstances of the crimes, defendant's record of unadjudicated violent crimes and felony convictions, his statement to sheriff's deputies evincing a lack of remorse for murdering Lees, and the impact of Lees's death on a number of people. The mitigating evidence was of mixed value: it showed that defendant had suffered from a hard childhood and perhaps mental problems, but it also showed that his antisocial behavior was partly responsible for his childhood difficulties and persisted even after he received and benefited from the care and devotion of others in a decent setting. In sum, the mitigating evidence was not particularly compelling. If defendant had preserved his Sixth Amendment claim for review, we would conclude that any error in admitting the evidence was harmless beyond a reasonable doubt under *Chapman v. California, supra*, 386 U.S. 18, 24 (*Satterwhite v. Texas, supra*, 486 U.S. 249, 256, 258 [applying the *Chapman* standard]; see *Arcega, supra,* at p. 525 [applying the *Chapman* standard to a Fifth Amendment claim of improper use of evidence gleaned from a competency examination]), and reversal of the judgment would not be required. Because we find no reasonable probability of a different outcome absent the admission of the evidence, we conclude that there was no ineffective assistance of counsel. (*People v. Mayfield, supra*, 5 Cal.4th 142, 199.)

VI. *Penalty Phase Instructional Error Claims*

A. *Accuracy of Instruction on Possessing Deadly Weapon in Jail*

As described (*ante,* at p. 222), the jury heard evidence pursuant to section 190.3, factor (b), that on three occasions defendant was caught with contraband razor blades in jail, in violation of section 4574, subdivision (a). The razor blades had been broken away from a modern form of safety razor. Defendant moved to have the jury instructed to disregard this evidence on the ground that, as a matter of law, the razor blades were not deadly weapons within the meaning of section 4574, subdivision (a) ("any person who, while lawfully confined in a jail . . . possesses therein any . . . deadly weapon . . . is guilty of a felony . . . ."). The court denied the motion. Following defendant's testimony that he had innocent reasons for possessing the razor blades, the jury was instructed, in pertinent part, that each juror could consider the episodes in

aggravation under factor (b) of section 190.3 if he or she found beyond a reasonable doubt that defendant had violated section 4574.

The jury was instructed, "To determine whether or not an item is a deadly weapon, you must look to the surrounding circumstances; the capability of its being used to inflict death or great bodily injury; and any inferences that may be drawn as to its intended possession." Defendant argues that the jury should have been instructed that the weapon must not only be capable of producing but also must be likely to produce death or great bodily injury, and that the court's failure to so instruct the jury violated his right to have the jury instructed on every element of the offense. (See *People v. Hughes, supra,* 27 Cal.4th 287, 383 ["The trial court, having decided to identify the other criminal activity and to instruct on its elements, had a duty to do so accurately and not mislead the jury."].) He discerns violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

If error had occurred, however, it would have been invited by defendant. The reporter's transcript makes clear that defendant proposed the instruction and not only acquiesced in, but endorsed, a minor modification to it. The trial court chose defendant's language in place of language the prosecutor preferred. Defendant cannot now complain of error. (*People v. Horning, supra,* 34 Cal.4th 871, 905.)

In any event, there was no error. The instruction the court gave reflects a standard instruction defining a deadly weapon that existed at the time of trial. (Former CALJIC No. 16.291 (5th ed. 1988) ["A deadly weapon means any weapon, instrument or object that is capable of being used to inflict·death or great bodily injury."].) The standard instruction for section 4574, subdivision (a), defines a *"deadly weapon"* as "any weapon, instrument, or object that has the reasonable potential of being used in a manner that would cause great bodily injury or death." (Judicial Council of Cal. Crim. Jury Instns. (2006) CALCRIM No. 2746; accord, CALJIC No. 7.34.02 (Oct. 2005 ed.); see *People v. Martinez* (1998) 67 Cal.App.4th 905, 908–912 [79 Cal.Rptr.2d 334].) The standard instruction did not exist at the time of trial, but it is materially indistinguishable from that which defendant requested.

### B. *Other Claims of Instructional Error*

Three miscellaneous claims, regarding burden of proof, lingering doubt, and premeditation and deliberation, require only brief discussion. First, neither *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], nor *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], has changed our prior conclusions regarding burden of proof. "The death penalty law is not unconstitutional for failing to impose a burden

of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence." (*People v. Brown, supra,* 33 Cal.4th 382, 401.) Second, notwithstanding defendant's view that the evidence justified requiring the trial court to instruct the jurors that they could consider any lingering doubt they might have had whether defendant intended to kill Lees, the trial court properly denied defendant's request to give the instruction. (*People v. Cleveland* (2004) 32 Cal.4th 704, 739 [11 Cal.Rptr.3d 236, 86 P.3d 302]; *People v. Sanchez* (1995) 12 Cal.4th 1, 77 [47 Cal.Rptr.2d 843, 906 P.2d 1129] ["there is no *requirement,* under either state or federal law, that the court specifically instruct the jury to consider any residual doubt of defendant's guilt"].) Third, defendant unsuccessfully requested that the jury be instructed that it could consider in mitigation any perception it might have that defendant lacked premeditation or deliberation before the murder of Lees. But such a pinpoint instruction is not required (see *People v. Lucero* (2000) 23 Cal.4th 692, 730 [97 Cal.Rptr.2d 871, 3 P.3d 248]), and the instructions given to the jury that it could consider the circumstances of the crime and anything that might extenuate its gravity (§ 190.3, factors (a), (k)) sufficed to permit it to consider the question.

### VII. *Prosecutor's Remarks During Closing Argument*

Defendant claims that his state and federal rights to a fair trial, to due process of law, to the assistance of counsel, to confront the witnesses against him, and to a reliable sentencing determination (U.S. Const., amends. V, VI, VIII, XIV; Cal. Const., art. I, §§ 7, 15; *People v. Carter* (2003) 30 Cal.4th 1166, 1227 [135 Cal.Rptr.2d 553, 70 P.3d 981]) were violated by improper remarks the prosecutor made during closing argument at the penalty phase. We disagree.

Defendant finds objectionable the following remarks by the prosecutor: (1) Dr. Woods's mental health testimony was so questionable that it could amount to malpractice; (2) it would benefit the community if the jury returned a death verdict; (3) defendant's poor record of conduct while incarcerated, including possessing hidden razor blades and escaping from the custody of the California Youth Authority before murdering Lees, showed that he would pose a continuing threat, including to female prison guards, if confined among the general prison population; and (4) life behind bars under a sentence of life imprisonment without possibility of parole would be relatively pleasant for defendant, because he could enjoy conjugal visits, marry, watch television, socialize with friends, and the like.

Because defendant did not object to, or request that the jury be admonished in light of, any of the foregoing remarks, he has forfeited the claim. " 'As a

general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Prieto, supra*, 30 Cal.4th 226, 259.)

Defendant maintains that if we find his claim forfeited, then counsel's failure to ask the court to intervene amounts to a denial of his right to the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution and article I, section 15 of the California Constitution.

As stated, a claim of ineffective assistance of counsel in violation of the Sixth Amendment entails deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of an adverse effect on the outcome. (*Strickland v. Washington, supra*, 466 U.S. 668, 687–688, 694.) The *Strickland* standards also apply to defendant's claim under article I, section 15 of the California Constitution. (E.g., *People v. Waidla, supra*, 22 Cal.4th 690, 718.)

"Failure to object rarely constitutes constitutionally ineffective legal representation . . . ." (*People v. Boyette, supra*, 29 Cal.4th 381, 424.) Moreover, "[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft, supra*, 23 Cal.4th 978, 1068–1069.) This was not a situation in which there could be no satisfactory explanation for counsel failing to object to the remarks of which defendant now complains. For one, at the outset of his closing argument, the prosecutor told the jury to disregard anything he would later argue that was not supported by evidence. "You don't make your decision based on hearsay things that . . . weren't presented to you from a live witness in court. You don't make your decision based upon what I say, because what I say is not evidence, and you know that. You don't make your decision based upon what . . . [defense counsel] says because that's not evidence. And to do anything other than . . . to make your decision based upon the facts you have here as presented in this case would be to do an injustice. [¶] You should keep that in the back of your mind when you're discussing what the evidence is. In other words, you're not to speculate about what could have happened, what should have happened, what did happen. You decide what, in fact, was proved here in court." Defense counsel could reasonably have decided that the prosecutor's prefatory admonition amounted to a sufficient warning to the jury to disregard any inferences not fairly supported by the evidence, and that

repeatedly objecting to specific remarks, even if successful, could draw more attention to their content than the jury would otherwise pay in light of the prosecutor's initial caveat.

■ Even if defendant had objected to the prosecutor's remarks, the objections would properly have been overruled, for in the main the remarks were not objectionable. The prosecutor was entitled to argue that Dr. Woods was not credible and was biased in favor of the defense. This was legitimate argument; even "[h]arsh and vivid attacks on the credibility of opposing witnesses are permitted" (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035]), and suggesting that Dr. Woods's testimony was so poorly founded that it amounted to malpractice fell within those bounds. It was also legitimate argument for the prosecutor to argue that if the jury could not protect society by sentencing defendant to death, its failure to do so would create an incentive for society to engage in improper self-help to protect itself. "These remarks were a permissible form of argument designed to show the circumstances in which society may be justified in taking one life to protect the lives of others." (*People v. McDermott, supra*, 28 Cal.4th 946, 1003.) The prosecutor's comments on defendant's potential to endanger others in prison, including female prison guards, if sentenced to life imprisonment without possibility of parole were likewise proper. We approved of similar remarks in *People v. Bradford* (1997) 14 Cal.4th 1005, 1063–1064 [60 Cal.Rptr.2d 225, 929 P.2d 544].

That leaves the question whether the prosecutor was entitled to argue to the jury that defendant would enjoy a number of benefits under a sentence of life imprisonment without possibility of parole. We need not address whether the remarks were improper in this case. Defendant relies on *People v. Hill, supra*, 17 Cal.4th 800, 838, in which we found similar comments to be improper. But as we stated, defendant has forfeited the claim by failing to object at trial, and we discern no ineffective assistance of counsel in that tactical choice. Defense counsel countered the prosecutor's statement about life imprisonment without possibility of parole by arguing in detail that such a punishment was unpleasant and severe. For all we can discern on this record, counsel may have preferred to offer the defense's bleak vision of the tribulations attendant to a lifelong prison sentence than to cut off discussion on the subject by objecting to the prosecutor's remarks. This forecloses defendant's ineffective assistance of counsel claim (*People v. Kraft, supra*, 23 Cal.4th 978, 1068–1069), and there is no need to discuss the merits of his contention. We decline to do so.[21]

---

[21] We note in passing that it is misconduct to misstate the law during argument (*People v. Boyette, supra*, 29 Cal.4th 381, 435), but it does not appear that the prosecutor did so in 1993, when the penalty phase was underway, by referring to the availability of conjugal visits under a sentence of life imprisonment without possibility of parole. Current prison regulations prohibit family, including conjugal, visits of inmates serving a sentence of life imprisonment

VIII. *Effect of Guilt Phase on Penalty Phase*

Defendant claims that two errors that he argues occurred at the guilt phase—admitting inculpatory statements in violation of *Miranda v. Arizona, supra,* 384 U.S. 436 (see *ante,* at pp. 197–198), and admitting unreliable hair comparison evidence (see *ante,* at pp. 199–200)—undermine the reliability of his sentence under the Eighth and Fourteenth Amendments to the federal Constitution and require its reversal. We have found no *Miranda* violation and no impropriety in admitting the hair evidence, however, so his claim fails for want of a sufficient predicate. He also argues that errors he argues occurred regarding the special circumstance findings (*ante,* at pp. 209–218) undermine his sentence's reliability. As we explained, however, any errors regarding the special circumstance findings were harmless, and again we reject his claim for want of a sufficient predicate.

IX. *Cumulative Error*

Defendant claims that the cumulative effect of errors that occurred during the penalty phase undermines the reliability of his sentence under the Eighth and Fourteenth Amendments to the federal Constitution and requires its reversal. We do not agree. For the reasons stated throughout our discussion of defendant's penalty phase claims, in which we found no error, we reject his claim of cumulative error as well.

X. *Scope of Eligibility Under the Death Penalty Law*

Contrary to defendant's urging, the death penalty law adequately narrows the class of death-eligible offenders and is not so inclusive as to violate the Eighth Amendment to the federal Constitution. (E.g., *People v. Coffman and Marlow, supra,* 34 Cal.4th 1, 129.)

XI. *Delay in Imposing Capital Punishment*

Also contrary to defendant's urging, the time he has spent awaiting execution does not amount to cruel and unusual punishment under the Eighth Amendment to the federal Constitution. (E.g., *People v. Lenart* (2004) 32 Cal.4th 1107, 1131 [12 Cal.Rptr.3d 592, 88 P.3d 498].)

---

without possibility of parole. (Cal. Code Regs., tit. 15, § 3177, subd. (b)(2) ["Family visits shall not be permitted for inmates who are in any of the following categories: sentenced to life without the possibility of parole . . . ."].) But it not does appear to have been the case in 1993, when the prosecutor made the argument to which defendant now objects, that inmates serving a sentence of life imprisonment without possibility of parole were automatically and necessarily excluded from conjugal visits. (See Cal. Code Regs., tit. 15, §§ 3170–3178 (1993); *id.,* tit. 15, §§ 3170–3182 (1994).)

XII. *Sentence Enhancement for Prior Convictions*

Defendant asserts, and respondent agrees, that defendant's sentence enhancement for prior convictions under section 667, subdivision (a), must be set aside because defendant was not represented by counsel during the hearing at which the trial court imposed it. The United States Court of Appeals for the Ninth Circuit has held that this result is constitutionally compelled (*Robinson v. Ignacio* (9th Cir. 2004) 360 F.3d 1044, 1050, 1054–1055; see also *id.* at p. 1056), and accepting the parties' jointly held view, we will set aside the sentence enhancement in this case. (See also *In re Perez* (1966) 65 Cal.2d 224, 228–231 [53 Cal.Rptr. 414, 418 P.2d 6] [holding that the state Constitution requires the presence of counsel at pronouncement of judgment and sentence].) The enhancement may, however, be imposed at a new hearing at which defendant is represented by counsel, if the hearing establishes that the enhancement is applicable.

CONCLUSION

The sentence enhancement for prior convictions under section 667, subdivision (a), is set aside. In all other respects, the judgment is affirmed.

George, C. J., Baxter, J., Chin J., and Corrigan, J., concurred.

**KENNARD, J.,** Dissenting.—In affirming defendant's capital murder conviction, the majority may be right. Or it may be wrong. At this point, however, it is impossible to tell, because of an ambiguity in the appellate record. On its face, the record shows that at the competency phase of trial the court read to the jury an instruction that was wrong and would necessitate reversal of the entire judgment. But there is the possibility that the court gave a correct instruction, which the court reporter then inaccurately transcribed. (The trial court gave no written instructions to the jury.) In holding that this court is better able than the trial court to decide what the trial court did say to the jury, this court, an appellate tribunal, has annointed itself the arbiter of fact. Unlike the majority, I would have the trial court conduct a hearing to decide, based on its own recollection of the matter and that of the parties' trial attorneys, what the oral instruction said.

I also disagree with the majority's holding that the trial court's erroneous response to a question by the jury at the guilt phase of defendant's capital trial was harmless. That error, in my view, requires reversal of the special circumstance findings and the judgment of death.

## I

At the jury trial to determine defendant's competence to stand trial for capital murder, Psychologist James Palmer expressed his opinion that defendant suffered from brain damage and was incompetent to stand trial, both because he did not understand the nature of the proceedings and because he was unable to cooperate with counsel. Psychiatrist John Peschau reached a similar conclusion, diagnosing defendant as suffering from paranoid schizophrenia. But testifying for the prosecution, two psychologists and a psychiatrist were of the view that defendant was malingering and that he was competent to stand trial. The prosecution also called three sheriff's deputies, who testified that defendant's behavior while in custody awaiting trial was normal most of the time.

The reporter's transcript shows that the court gave this oral instruction: "[A] person charged with a criminal offense is deemed mentally competent to be charged with the crime against him, if he is capable of understanding the nature and purpose of the proceedings against him; second, if he comprehends his own status and condition in reference to such proceedings. [¶] If he is able to assist his attorney in conducting his defense in a rational manner, the defendant is presumed to be mentally competent, and he has the burden of proving by a preponderance of the evidence that he is mentally incompetent, as a result of mental defect, or disorder." The words of this instruction are similar to the standard CALJIC instruction defining competence to stand trial, but its meaning is not.[1]

The reported instruction is wrong. Under California law, a defendant is incompetent to stand trial if "the defendant is unable to understand the nature of the criminal proceedings *or to assist counsel in the conduct of a defense in a rational manner.*" (Pen. Code, § 1367, subd. (a), italics added.) But under the instruction that, according to the reporter's transcript, the trial court gave in this case, *the jury did not have to decide whether defendant was able to assist his attorney in a rational manner in order to find him competent*; that

---

[1] The corresponding portion of the CALJIC instruction states: "[A] person charged with a criminal offense is deemed mentally competent to be charged with the crime against him: 1. If he is capable of understanding the nature and purpose of the proceedings against him; and [¶] 2. If he comprehends his own status and condition in reference to such proceedings; and [¶] 3. If he is able [to assist his attorney in conducting his defense] [to conduct his own defense] in a rational manner. [¶] The defendant is presumed to be mentally competent, and he has the burden of proving by a preponderance of the evidence that he is mentally incompetent as a result of a mental defect or disorder [or developmental disability]." (CALJIC No. 4.10 (4th ed. 1984 rev.).) The most significant differences between this instruction and the instruction appearing in the reporter's transcript are these: (1) The CALJIC instruction has a semicolon and the words "and 3." after "such proceedings," but the reporter's transcript has a period and a new sentence; (2) the CALJIC instruction has a period and a new sentence after the words "rational manner," but the reporter's transcript has a comma.

instruction told the jury defendant was competent if he understood the proceedings and his own status in relation to those proceedings. Thus, if the court reporter accurately transcribed the trial court's spoken instruction to the jury, the instruction removed from the jury's consideration a crucial element of the competency determination from the jury's consideration, namely, whether defendant was able "to assist counsel in the conduct of a defense in a rational manner."

From this cold record the majority makes a factual determination that the trial court actually instructed the jury correctly, but that the court reporter inaccurately transcribed the instruction. The majority asserts: "Because the court clearly was reading a standard instruction, it is far more likely that the punctuation supplied by the court reporter failed to accurately reflect the meaning conveyed by the court's oral instructions than that the court misread the standard instruction." (Maj. opn., *ante,* at p. 191.) How does it know? This court has seldom, if ever, been faced with a party's allegation that a reporter's transcript contained incorrect punctuation. So far as this court knows, misreading by the trial court is just as likely as mispunctuation by the reporter.

The majority claims, without citation of authority, that this court is "not bound by the punctuation supplied by the court reporter."[2] (Maj. opn., *ante,* at p. 191.) I disagree.

There are three possible explanations for the differences between the reporter's transcript and the standard CALJIC instruction: (1) The trial court deliberately altered the instruction; (2) the court inadvertently misread the instruction to the jury; or (3) the court read the instruction correctly to the jury, but the court reporter inaccurately transcribed what the court said. The factual determination as to which of these three events occurred at trial is to be made by the trial court, not by this court on review of a cold record.

Although the Attorney General now claims the reporter's transcript is inaccurate, the proper time for him to have raised this point was during record correction proceedings. But at that time the Attorney General made no mention of the matter. Thereafter, defendant's opening brief on appeal argued

---

[2] The majority goes on to acknowledge that the instruction in the reporter's transcript does not merely differ in punctuation from the CALJIC instruction, but that certain words are also omitted. I will not discuss the majority's laborious and complicated attempt to explain why the omission of these words would not have confused the jury, other than to note that the explanation is based on the premise that this court may decide that the trial court did not read the instruction with the punctuation noted in the reporter's transcript. As I explain in the text, this premise is false: It is the trial court, not this appellate tribunal, that must decide not only what the trial court said to the jury, but how the court said it, and thus whether the punctuation accurately represents the court's spoken instruction.

that the trial court's competency instruction required reversal of the judgment; that argument was based on the premise that the court reporter had accurately transcribed the trial court's oral instruction. At that time, the Attorney General had another chance to bring the matter before the trial court by moving to correct the record on the ground that the instruction was inaccurately transcribed. (Cal. Rules of Court, rule 12(c).) Again, he failed to do so.

At the conclusion of the record correction proceedings, the trial court certified the record of the trial proceedings, including the reporter's transcript, as "complete and accurate." (Cal. Rules of Court, rule 35.3(d).) That was a factual finding by the trial court that the court reporter had accurately transcribed the court's oral instruction at issue here. An appellate tribunal such as this court cannot second-guess that factual finding, regardless of whether the finding pertains to punctuation or to the words that the trial court spoke. In the words of this court more than a century ago: "[W]hen an exception to a particular ruling has been allowed this court has no authority to strike out any evidence or other matters stated in connection with such ruling upon the ground that such evidence was not given, or that such matters are untruly or incorrectly stated . . . . If the judge has put in incorrect statements of evidence, or other matters bearing upon his rulings, or has omitted evidence or other matters claimed to be material, *the evil is not remediable here.*" (*Estate of Dolbeer* (1905) 147 Cal. 359, 361 [81 P. 1098], italics added; see also *Marks v. Superior Court* (2002) 27 Cal.4th 176, 196 [115 Cal.Rptr.2d 674, 38 P.3d 512]; *Burns v. Brown* (1946) 27 Cal.2d 631, 636 [166 P.2d 1].)

I also disagree with the majority that any instructional error was harmless. The majority declines to decide whether the error violates the federal Constitution or is merely a violation of state law. In my view, it is the former. As the United States Supreme Court has explained: "We have repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.' . . . The test for incompetence is also well settled. A defendant may not be put to trial unless he ' *"has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him."* ' " (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354 [134 L.Ed.2d 498, 116 S.Ct. 1373], italics added.) Thus, the due process clause of the federal Constitution requires that *both* requirements of California's statutory test for incompetency be satisfied: Not only must the defendant understand the nature of the charges, but he also must be able to rationally assist defense counsel. Here, if the reporter's transcript is accurate, the trial court's instruction allowed the jury to find defendant competent without deciding whether he was able to assist his attorney. Therefore, the instructional error violated the federal Constitution, in which case the prejudicial effect must be measured under the test the high court established in *Chapman v. California* (1967) 386 U.S. 18

[17 L.Ed.2d 705, 87 S.Ct. 824], which requires reversal unless the prosecution can show that the error was harmless beyond a reasonable doubt.

When, as here, the federal constitutional error involves the trial court's failure to instruct on a necessary element, reversal is required under the *Chapman* test when "the defendant contested the omitted element and raised evidence sufficient to support a contrary finding" (*Neder v. United States* (1999) 527 U.S. 1, 19 [144 L.Ed.2d 35, 119 S.Ct. 1827]); but the error is not prejudicial when it is clear "beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence" (*id.* at p. 17).

At the competency proceeding here, defendant contested the omitted element—his ability to assist his attorney in presenting a defense—by calling a psychologist and a psychiatrist, both of whom testified that he was incompetent because of his inability to cooperate with his counsel. Although the majority stresses the strength of the prosecution's evidence that petitioner was competent (maj. opn., *ante*, at p. 193), the high court in *Neder* has said that the prosecution's evidence is irrelevant, so long as the defense has presented evidence "sufficient to support a contrary finding." (*Neder v. United States, supra,* 527 U.S. at p. 19.) Here, the testimony by defendant's expert witnesses was sufficient to support a jury finding that he was unable to cooperate with his attorneys. Thus, if the trial court's instruction did remove from the jury's consideration the issue of defendant's ability to cooperate with his counsel, reversal is required.

To reverse the judgment based on instructional error at the competency phase is, however, premature, because it is not at all clear whether the trial court did erroneously instruct the jury, or whether the court reporter inaccurately transcribed the court's oral instruction to the jury. When a reviewing court becomes aware that the appellate record may be inaccurate, it "may order the superior court to settle disputes about omissions or errors in the record." (Cal. Rules of Court, rule 12(c)(2).) I would therefore vacate submission of this matter and direct the superior court to conduct additional record correction proceedings to determine the true state of the record. In those proceedings the trial court would hear from the attorneys who tried the case and, based on the court's own recollection and that of the attorneys, would determine what the court said in instructing the competency jury. Thereafter, this court should recalendar the case for oral argument, and only then should it decide whether instructional error occurred and, if so, whether that error was prejudicial.

One final note. If the trial court had provided the jury with written instructions, it would not have mattered whether the court reporter accurately

transcribed the court's oral instructions to the jury, because when there is an inconsistency between the trial court's oral and written instructions, it is assumed that the jury followed the written instructions. (*People v. Osband* (1996) 13 Cal.4th 622, 717 [55 Cal.Rptr.2d 26, 919 P.2d 640].) Especially in cases involving the death penalty, it is important that the trial court "should generally give the jury written instructions to cure the inadvertent errors that may occur when the instructions are read aloud." (*People v. Seaton* (2001) 26 Cal.4th 598, 673 [110 Cal.Rptr.2d 441, 28 P.3d 175].) This case illustrates the wisdom of providing juries with written instructions.

## II

Defendant was charged with murdering Sarah Lees, and the prosecution alleged as special circumstances that the killing occurred during a burglary, a robbery, and an attempted or completed rape. At the time of the murder, the special circumstances required proof that the defendant intended to kill the victim. (*People v. Johnson* (1993) 6 Cal.4th 1, 44 [23 Cal.Rptr.2d 593, 859 P.2d 673].)

At the guilt phase of defendant's capital trial, the prosecution presented strong evidence that defendant acted with the intent to kill Lees, who came home while defendant was burglarizing her house and was shot to death with her own shotgun. Expert witnesses testified that the fatal shot was fired into the middle of her back at a range of between six and 18 inches, and that the shotgun required between six and seven pounds of force on the trigger to discharge. The prosecution also presented evidence that Lees had been sexually assaulted.

Testifying on his own behalf, defendant denied that he had intended to kill Lees. He claimed that he grabbed the shotgun off a counter when Lees ran from her bedroom toward the front door, and that the gun accidentally discharged. Criminalist Richard Fox testified that the shotgun could have accidentally discharged if it had been handled in the manner described in defendant's testimony.

The case was submitted to the jury on August 2, 1990. That same day, the jury signed verdict forms convicting defendant of first degree murder, burglary, and robbery, leaving only the special circumstance allegations still to be decided. The jury was still deliberating on the special circumstances on August 8, the third day of deliberations. On that day, the jury submitted to the trial court three questions, one of which is pertinent here: "Is intent only in the act itself, or with the end result. (ex: Knowing someone is shot but not

tending to the persons best interest) [if shot & let her die . . . is itself killing][3] Is intent before, during, or after the act of crime."

The trial court answered: "[Y]ou can't X-ray a person's mind. So how do you find out the intent with which an act is done? [¶] You look at a statement of the intent made by the defendant, by the circumstances attending the act, the manner in which it is done, and the means used. So you look to what he said, what really happened, how did the killing occur, what did he use to kill, what kind of an instrument; and from all those things you then decide what is it that he had in his mind. [¶] In other words, you can infer the intent from the nature of the act. You can infer the intent from the nature of the act. [¶] In other words, if you act in a certain way, *knowing that a result, death, is likely to follow, whether you want to kill or not*, you still have the intent to kill because if you act in a certain way, *knowing that the result, death, is likely to happen, whether you desire to kill or not doesn't make any difference.* You still have the intent to kill. [¶] You got it?" (Italics added.)

The jury's question shows that it was deadlocked on whether the shooting of Lees was accidental or intentional, and it wanted to know whether it could find an intent to kill based on defendant's conduct *after shooting* Lees, when instead of "tending to [her] best interest," such as summoning assistance, he simply let her die. When, as in this case, the jury asks a question about the meaning of an element of the crime, Penal Code section 1138 imposes on the trial court "a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212 [275 Cal.Rptr. 729, 800 P.2d 1159].) But here, the trial court's response did not directly answer the jury's question. It told the jury that in deciding whether defendant intended to kill Lees, it "doesn't make any difference" whether he wanted Lees to die, so long as he knew she was "likely" to die if he "act[ed] in a certain way." Based on that answer, a reasonable jury could conclude that defendant's actions in accidentally shooting Lees (as he testified) and then fleeing the scene without treating her shotgun injury or calling for help would justify a finding of intent to kill if, at the time of flight, he knew she was "likely" to die if he did not help her.

That theory of intent to kill is simply wrong, as this court held in *People v. Balderas* (1985) 41 Cal.3d 144 [222 Cal.Rptr. 184, 711 P.2d 480]. There, two witnesses testified that the defendant left the murder victim, Neil Wanner, "at the isolated scene of the shooting despite the bleeding victim's pleas for help." (*Id.* at p. 199.) We said that this conduct did not satisfy the special circumstance requirement that the defendant act with intent to kill: "[E]ven if

---

[3] The bracketed words were written in cursive, while the rest of the note was printed. It is unclear whether the bracketed words were written by the same person who wrote the rest of the note.

it was apparent to defendant that the wound might be fatal unless he helped Wanner obtain treatment, a jury could reasonably conclude that defendant's behavior suggests only the 'implied malice' arising from 'an abandoned and malignant heart.' (§ 188.) We have made clear that this form of 'implied malice'—a base, antisocial indifference to the probability that one is causing death—does not satisfy the . . . standard of intent to kill, which means the specific intent to take another's life." (*Ibid.*)

The trial court's instruction here is also inconsistent with *People v. Velasquez* (1980) 26 Cal.3d 425 [162 Cal.Rptr. 306, 606 P.2d 341]. There, the lead opinion of this court stated, in dictum, that to act with intent to kill, " 'the actor must either desire the result or *know, to a substantial certainty, that the result will occur.*' " (*Id.* at p. 434 (lead opn. of Tobriner, J.), italics added.) Whether or not the *Velasquez* lead opinion's definition is correct,[4] here the trial court's definition of intent to kill was considerably broader than that of *Velasquez,* because it told the jury that defendant acted with intent to kill not only if death was "substantially certain," but also if it was only "likely" to follow from his actions.

An inaccurate instruction on an element of a special circumstance allegation is prejudicial unless the prosecution can show beyond a reasonable doubt that the error did not contribute to the verdict. (*People v. Osband, supra,* 13 Cal.4th at p. 681; *Chapman v. California, supra,* 386 U.S. 18, 24.) In applying that test, a reviewing court must not consider "what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict *in the case at hand.*" (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182, 113 S.Ct. 2078], italics added.) Here, based on the trial court's erroneous answer to the jury's question on intent to kill, the jury may well have concluded that defendant intended to kill Lees because he failed to treat her shotgun injury or to seek help after he shot her, realizing that Lees was likely to die if he acted in the manner just described. This theory of the jury was legally unsound. (*People v. Balderas, supra,* 41 Cal.3d 144.) Because the Attorney General has failed to show beyond a reasonable doubt that the trial court's answer to the jury's question was harmless, I would reverse the jury's special circumstance findings and the judgment of death.

---

[4] The majority here declines to decide whether, as the lead opinion stated in *People v. Velasquez, supra,* 26 Cal.3d at page 434, a person who does not desire the victim's death, but knows to a substantial certainty that death with result from the defendant's actions, acts with intent to kill. The majority explains that it need not decide this issue because the trial court's answer to the jury was *harmless* regardless of whether *Velasquez* is correct. Like the majority, I see no reason to decide the issue, but for a different reason: In my view, the trial court's answer to the jury was *prejudicial* regardless of whether *Velasquez* is correct.

The majority reasons that the error was harmless because, given that Lees was shot in the back at close range, "the jury would have had to conclude that defendant knew Lees was substantially certain to die unless medical help arrived promptly." (Maj. opn., *ante*, at p. 212.) Defendant, however, testified that he did not know the shot had hit Lees in the back. Even if the jury did not credit this testimony, it could have concluded that defendant knew Lees was shot but was unaware of how seriously she was hurt, and thus he did not realize she was substantially certain to die without treatment. Because there was *conflicting* evidence at trial about defendant's knowledge of the extent of Lees's shotgun injury, the majority is wrong when it concludes that, beyond a reasonable doubt, the jury would inevitably have found that defendant knew Lees's shotgun injury was substantially certain to result in her death.

CONCLUSION

For the reasons explained in part I, *ante*, I would vacate submission in this case and direct the trial court to determine the accuracy of the reporter's transcription of the court's oral instruction to the jury defining competency to stand trial. (Cal. Rules of Court, rules 12(c)(2), 36.1(c).) Under that approach, the resolution of this appeal would depend on the trial court's determination. (See p. 190, *ante*.) The majority's refusal to vacate submission, however, has compelled me to consider defendant's claims of error other than the one pertaining to the trial court's oral instruction at the competency trial. For the reasons expressed in part II, *ante*, I would reverse the jury's special circumstance finding and the judgment of death.

Werdegar, J., concurred.

Appellant's petition for a rehearing was denied May 24, 2006, and the opinion was modified to read as printed above. Kennard, J., was of the opinion that the petition should be granted.